FILED

2025 Feb-11  PM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **LATONYA CHAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:21-CV-1571-CLM** |
| | ) | |
| **CALHOUN COUNTY SHERIFFS** | ) | |
| **DEPARTMENT, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendant, Calhoun County Sheriff Matthew Wade ("Defendant" or "Sheriff Wade"), submits this brief in support of his Motion for Summary Judgment, (Doc. 54). As explained below, Defendant is entitled to summary judgment on all of Plaintiff Latonya Chames's ("Plaintiff" or "Chames") claims in their entirety.

## TABLE OF CONTENTS

**INTRODUCTION**......................................................................................................1

**SUMMARY JUDGMENT STANDARD** ..................................................................2

**STATEMENT OF UNDISPUTED FACTS**..............................................................3

    **I. <u>The Calhoun County Civil Service System</u>** ..........................................4

        **A. Responsibilities of Board & Commission** ...............................4

        **B. Civil Service Employees, Breaks in Service & Exemptions** ..................5

        **C. Determination of Individual Civil Service Employee's Rate of Pay** ......................................................6

    **II. <u>Plaintiff's Work History & General Job Duties</u>** ................................8

        **A. Corrections Officer: 2002 to 2008** ...........................................8

    **III. <u>Structure of Calhoun County Sheriff's Department</u>** .............................11

        **A. Chain of Command**.....................................................................11

        **B. Divisional Responsibilities & Jurisdiction**.............................12

    **IV. <u>Chames's Limited Involvement in, and Knowledge of, Other Divisions</u>**......................................................................13

    **V. <u>Sheriff Employees & Civil Service System</u>** .......................................14

        **A. Non-Civil Service Employees**...................................................14

        **B. Sheriff Non-Civil Service Employees Rate of Pay** ................16

    **VI. <u>Plaintiff's Rate of Pay as Corrections Lieutenant</u>**..................................17

    **VII. <u>Other Lieutenants & Supervisors</u>** .........................................................17

**VIII. <u>Plaintiff's Alleged Reporting of Discrimination & Retaliation</u>** ..........19

**IV. <u>EEOC Charges</u>** ................................................................................21

**ARGUMENT** ............................................................................................22

**I. Plaintiff's EPA Claims Fail As A Matter of Law.** ....................................22

**1. Plaintiff fails to establish a prima facie case because there is no evidence Plaintiff's job was "substantially similar" to the other lieutenants.** ..........................................................24

**2. Factors Other Than Sex Account for Different Pay Rates** ................26

**II. Plaintiff's Title VII, § 1981, and § 1983 Claims Fail As A Matter of Law** ..............................................................29

**III. Plaintiff's § 1981 Claim Fail sAs A Matter of Law.** ................................34

**CONCLUSION** ..........................................................................................35

**CERTIFICATE OF SERVICE** ........................................................................37

# **INTRODUCTION**

Defendant has employed Plaintiff, an African American female, as a corrections lieutenant since April 2016. Plaintiff, like all other corrections lieutenants, is a civil service employee and paid according to a pay scale established by the Calhoun County Civil Service Board ("Board") and the Calhoun County Commission ("Commission"). Plaintiff believes she should be paid at a rate comparable to all other lieutenants, though, including the lieutenants within the patrol and investigations divisions of the Sheriff's Department because these other lieutenants are the same rank as Plaintiff and they are all supervisors.

That is where the comparisons stop and the differences begin though. Just like a state corrections officer isn't the same as a state trooper, or a lieutenant in the Navy isn't the same as a lieutenant in the Air Force or Army, a corrections lieutenant for the Calhoun County Jail ("Jail") is different from a deputy sheriff. Indeed, the similarities end, and the differences start at the jailhouse door. Moreover, the pay disparity, which is evident in the pay scale's objective differential treatment of correction officers and sheriff deputies, is a result of non-pretextual, legitimate, non-discriminatory factors other than sex. Finally, neither the Sheriff, nor anyone in the Department, took any retaliatory action after Plaintiff reported the pay disparity. At bottom, the Sheriff would like to pay Plaintiff, along with his other employees, more but cannot due to budget cuts and civil service constraints.

1

As a result, Defendant is entitled to summary judgment as to Plaintiff's "unequal pay claims" under the EPA and Title VII in Counts 6 and 9 because (1) Plaintiff fails to establish her prima facie case because the lieutenant positions at issue are not "substantially similar," and (2) the pay differential is based on factors other than sex.

Defendant is entitled to summary judgment on Plaintiff's claim of race and gender discrimination under § 1981, § 1983, and Title VII in Counts 1, 4, 5, 7, and 8, because (1) she fails to establish her prima facie case of identifying comparators, (2) or, alternatively, she fails to present a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination, (3) Defendant has articulated a legitimate, non-discriminatory reason for its actions which Plaintiff cannot rebut, and (4) Plaintiff cannot establish pretext.

Finally, Defendant is entitled to summary judgment on Plaintiff remaining retaliation claim under § 1981 because (1) she cannot establish a prima facie case, specifically that her complaints about compensation were the "but-for" cause of any adverse action, (2) any adverse action was the result of a legitimate, non-retaliatory reason, and (3) Plaintiff cannot establish pretext.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311.

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

## STATEMENT OF UNDISPUTED FACTS

1.    Plaintiff Latonya Chames, a corrections lieutenant employed by the Calhoun County Sheriff, believes her hourly rate of pay should be comparable to that of all other lieutenants who work at the Sheriff's office, including those in the

patrol/enforcement division and the investigations division. (Doc. 55-1, pp. 142:11-143:3).

2. Plaintiff thinks her rate of pay should be equal to that of all other lieutenants because they are assigned the same rank in the chain of command and in supervisory roles. (*Id.* at 143:4-8).

## I.    <u>The Calhoun County Civil Service System</u>

3. In 1996, the legislature created the Calhoun County Civil Service System. (*See* § 45-8-120, *et seq.*; *see also* Doc. 55-2).

4. This local law also created the Calhoun County Civil Service Board ("Board"). (*See* § 45-8-120).

### A.    Responsibilities of Board & Commission

5. Under the System, the County Commission is responsible for authorizing funding for civil servant positions as determined to be necessary and within the financial resources of the county. (*Id.*).

6. The Board is responsible for assigning each approved position its proper classification. (*Id.*).

7. The Board is also responsible for, in relevant part, approving, in coordination with the county commission, any across-the-board increases or decreases, and establishing equitable pay levels for the different classifications subject to approval of the county commission. *See* § 45-8-120.07(4), -120.07(10).

4

8.    The Board is responsible for ensuring that every employee's pay and benefits, as provided for under the System, is established and maintained fairly, equitable, and consistently. (Doc. 56-1, p. WADE_0341, § 10.1.1).

9.    To this end, the Commission is responsible for the development and submission to the Board recommended pay levels for each pay grade of the Board's classification plan. (*Id.* at WADE_0342, § 10.4.1).

**B.    Civil Service Employees, Breaks in Service & Exemptions**

10.    The System applies to, in relevant part, non-exempt employees of the sheriff whose employees are paid from county-controlled funds, regardless of the source of such funds. (*See* § 45-8-120).

11.    The appointment and employment of a civil servant is upon a merit basis and without regard to race or sex. (*See* 45-8-120.03; *see also* Doc. 56-1, p. WADE_0273, § 1.4).

12.    Employees are exempt from the system, in relevant part, if they are either independent contractors under contract with the county, or any individual who is not paid exclusively by Calhoun County. (*See* 45-8-120.01(f), -120.01(i)).

13.    If a civil service employee resigns in good standing and is rehired within a two-year period, the employee's break in service does not affect any employment matter, including longevity increases in pay. (*See* Doc. 56-1, § 10.5.2).

14.     However, if the civil service employee is re-hired after a +2-year break in service, then all privileges of re-employment are inapplicable and their employment anniversary date resets. (*See Id.*, WADE_0344, § 10.6.4).

**C.     Determination of Individual Civil Service Employee's Rate of Pay**

15.     All civil service employees that are not salaried are hourly employees, meaning they are paid only for those hours worked, approved on leave time, overtime, or mutually agreed upon compensatory time. (*Id.*, p. WADE_0343, § 10.6.1.)

16.     An hourly civil service employee's hourly rate of pay for the employee's job is based on the applicable yearly pay scale and any across the board or cost of living increases. (*Id.*)

17.     An employee's rate of pay based on the pay scale is determined by the classification of the employee's job, and the years of civil service as determined from their work anniversary date. (*Id.*; *see also Id.* at WADE_0342-43, § 10.5.1.)

18.     An employee's years of service determines what level of longevity pay increase they are entitled to on the pay scale which generally results in a 1.3% increase each year. (*Id.*)

19.     In addition, an APOST ("Alabama Peace Officer Standards & Training") certified deputy may be hired at a step on the pay scale commensurate

with the number of years of service that the deputy has been served as active certified officer in the State of Alabama. (*Id.* at WADE_0344, § 10.6.6).

20.    Increases available to all civil service employees—such as, across the board increases and cost of living increases—must be recommended by the Commission and then approved by the Board. (*Id.* at WADE_0344, § 10.7).

21.    As it relates to the Sheriff's employees, the following positions, relevant to this case, are identified on the 2023 pay scale, in order of highest initial pay: (1) Jail Administrator (a.k.a., Corrections Captain); (2) Corrections Lieutenant; (3) Deputy Sergeant; (4) Deputy; (5) Corrections Sergeant; and (6) Corrections Officer. *See* Doc. 56-17, p. WADE_0028).

22.    From 2016-2018, the starting pay for a corrections lieutenant was just $0.03 higher than that of a deputy sergeant, and only $0.04 higher in 2019. (Doc. 56-18, WADE_4148, _4155, _4158, 4162).

23.    The pay rate for a Sheriff's employees in the patrol/enforcement and investigations divisions that are classified on the pay scales have always been higher than that of their corrections division counterparts. (*See* Doc. 54-17; Doc. 56-18, WADE_4148, _4155, _4158, 4162).

## II.    **Plaintiff's Work History & General Job Duties**

### A.    **Corrections Officer: 2002 to 2008**

24.    Plaintiff was initially hired as a temporary corrections officer by the Calhoun County Sheriff on January 22, 2002. (Doc. 56-23)

25.    After completing a provisional period, Plaintiff became a full-time corrections officer on July 25, 2002, and gained civil service status. (*See* Doc. 56-24)

26.    As a Corrections Officer, Chames's primary focus was the safety and security of the facility, which entailed doing security checks, ensuring inmate compliance with jail rules, booking, training other officers, feeding inmates, and passing out mail. (Doc. 55-1, pp. 23:11-24:11).

27.    Chames did not have any responsibilities outside the jail other than transporting inmates. (*Id.*, 23:11-24:11).

28.    In December 2008, Plaintiff left her role as corrections officer and was hired as a Licensed Practical Nurse for the Calhoun County Jail by the Calhoun County Commission. (Doc. 56-28; 55-1, pp. 135:1-136:8).

29.    Chames was paid $35,000 per year as an LPN, was an independent contractor hired by the Commission, and did not receive yearly raises in that role. (Doc. 55-1, pp. 38:4—39:3).

30.     In her LPN contract, Plaintiff voluntarily acknowledged she would no longer be in a classified civil service position. (*Id.*)

31.     Plaintiff was an LPN independent contractor for the Commission as LPN for the Jail for over 6 years, (Doc. 55-1, 136:6-)8, and because she was not a civil servant for over 2 years, Plaintiff's years of service under the civil service law "reset," meaning she would not receive credit for her years of service as a full-time civil service corrections officer if she was re-hired in a civil service position. (*See* Doc. 56-1, p. WADE_0344, § 10.6.4).

32.     In late 2015, Plaintiff left her role as LPN for the Commission and was hired by the Sheriff as a temporary corrections lieutenant for a period of 90 days, which was then extended by an additional 90 days.

33.     The Sheriff hired Plaintiff as a temporary corrections lieutenant in late 2015, and then hired her full-time in April 2016.

34.     When she was hired a full-time corrections lieutenant, she also became a civil service employee. (Doc. 55-1, p. 44:20-23).

35.     Plaintiff has never sought a promotion and has no aspirations to do so. (Doc. 55-1, pp. 36:22-37:11).

36.     As a Corrections Lieutenant, Chames is responsible for overseeing all jail operations, including booking, supervision of sergeants and corrections officers, inmate complaints, and the daily running of the facility. (Doc. 55-1, p. 34:13-17).

37.    According to Plaintiff, she directly supervises corrections sergeants and, by extension, corrections officers. (Doc. 55-1, p. 80:5-14).

38.    Sheriff Wade generally deputizes corrections division supervisors to provide them with legal protections, i.e., Alabama Sovereign Immunity. (Doc. 55-2, pp. 170:18-171:19).

39.    This does not make these corrections officers a deputy sheriff or qualify them to perform the typical job duties of a deputy sheriff. (*Id.*)

40.    For example, while Plaintiff is qualified to be a corrections lieutenant, but Plaintiff is <u>not</u> qualified to be a deputy lieutenant within the patrol/enforcement division. (Doc. 55-2, p. 160:17-21).

41.    Plaintiff is not APOST certified. (Doc. 55-1, pp. 81:23-82:1).

42.    APOST certification is required to be a certified law enforcement in Alabama and entails a 16-week training course and then continuing education thereafter. (Doc. 55-2, p. 259:2-15).

43.    Because Plaintiff is not APOST certified, she cannot make arrests and, to do so, would have to be under direct supervision of a deputy certified to make arrests. (Doc. 55-2, p. 174:4-12; Doc. 56-4, § 36.100).

44.    As Plaintiff testified, there is no reason for her to be APOST certified because the arrestees or inmates are already in custody when they arrive at the jail. (Doc. 55-1, pp. 165:14-17). Indeed, the correctional equivalent of APOST—

10

APOST-C—is not even available to county corrections employees, only to state corrections employees. (Doc. 55-2, pp. 258:2-10).

## III.  <u>Structure of Calhoun County Sheriff's Department</u>

45.    Defendant Calhoun County Sheriff Matthew Wade was appointed Sheriff in 2016 after the retirement of Sheriff Larry Amerson and is now in his third term as Sheriff.[1]

46.    The Sheriff's Department has three divisions—Patrol (also known as Enforcement), Corrections, and Investigations. (Doc. 55-1, p. 51:4-9).

### A.    Chain of Command

47.    Within the Sheriff's Office's chain of command, the Sheriff is the highest-ranking official followed by the chief deputy, then captains, lieutenants, and sergeants. (Doc. 55-1, p. 50:2-54:17).

48.    There is only one Sheriff and one chief deputy. (*Id.*)

49.    There are three captains-one for each division—so that there is a Patrol Captain, Corrections Captain (sometimes referred to as Jail Captain or Administrator), and an Investigations Captain—and below these divisional captains are multiple divisional lieutenants, such that there are two Corrections Lieutenants,

---

[1] District courts may take judicial notice of matters that are accessible to the general public and "are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Bryan v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999).

one Patrol Lieutenant, and one Investigations Lieutenant. (*Id.*; Doc. 55-1, pp. 57:13-58:11; *Id.* at p. 66:12-17; *see also* Doc. 55-1, pp. 58:12-59:10).

50.    In the corrections division, the chain of command begins with the corrections captain (a.k.a., jail administrator), then jail lieutenants, then jail sergeants, then jail corporals, and ends with corrections officers. (Doc. 55-2, p. 87:2-6).

### B.    Divisional Responsibilities & Jurisdiction

51.    The Corrections Division is responsible for the custody, care, and control of the jail and inmates. (Doc. 55-1, pp. 53:21-54:4).

52.    The jurisdiction of the Corrections Division is limited to all persons booked into the county jail system during the time they are inmates of the corrections division. (Doc. 55-1, p. 179:3-13; *see also* Doc. 56-4, p. WADE_0468).

53.    The jurisdiction of the Enforcement/Patrol Division extends to the geographical boundaries of Calhoun County. (Doc. 55-1, p. 178:4-13; *see also* Doc. 56-4, p. WADE_0453).

54.    So while deputies could be in the jail, they are typically not. (Doc. 55-2, pp. 142:20-143:1).

55.    Deputies work 12-hour shifts, while Sheriff employees within the investigations and corrections divisions work 8-hour shifts. (Doc. 55-2, p. 183:5-6).

**IV.**    **Chames's Limited Involvement in, and Knowledge of, Other Divisions**

56.    According to Mrs. Chames, corrections lieutenants, such as herself, do not have any job duties related to the enforcement division or investigations division. (Doc. 55-1, pp. 53:13-54:7).

57.    Mrs. Chames does not know what duties or responsibilities are assigned to the enforcement or investigations divisions. (*Id.*)

58.    While Mrs. Chames, as a corrections lieutenant, directly supervises corrections sergeants and corrections officers, she does not directly supervise sheriff's deputies in the enforcement division. (Doc. 55-1, pp. 80:5-81:12).

59.    She does not know how the jobs of patrol lieutenant and corrections lieutenant differ. (Doc. 55-1, p. 72:7-10).

60.    She does not know how many patrol sergeants there are, or who the patrol lieutenant supervises. (Doc. 55-1, p. 72:15-22; *Id.* at p. 72:4-6).

61.    Plaintiff does not know the difference between a deputy sheriff and a corrections officer—i.e., the lowest ranking employees in the patrol and corrections divisions, respectively. (Doc. 55-1, p. 72:20-22).

62.    Plaintiff does believe that the positions are different, though, as corrections officers work inside of a corrections facility and conduct inmate transports, while deputy patrol out in the public. (Doc. 55-1, p. 76:12-21).

63.     Plaintiff does not know the job duties of the investigation division lieutenant, the number of persons who work in the investigations division, or how the investigations division differs from corrections. (Doc. 55-1, p. 84:6-14).

64.     Plaintiff does not know what certifications enforcement lieutenants have that corrections lieutenants do not. (Doc. 55-1, p. 143:20-23).

## V.     Sheriff Employees & Civil Service System

65.     The Sheriff has both civil service and non-civil service employees. (Doc. 55-2, p. 107:17-19).

66.     All Sheriff employees, regardless of whether they are civil service or non-civil service, are hourly employees. (Doc. 55-2, 133:7-11).

### A.     Non-Civil Service Employees

67.     Since the early 2000s, the Sheriff's Department operated under a system that grew out of the need to quickly hire corrections officers and other positions that the Commission would not fund. (Doc. 55-2, pp. 108:7-113:4; *see also Id.* at p. 163:6-14).

68.     To fund these positions, the Sheriff, with the approval of the Commission, would use grant monies from other federal, state, or local government entities, like the Mental Health Officer Board,  and various funds that he controlled, such as the Federal Inmate Fund (a.k.a., 65% Fund), or the Sheriff's Law Enforcement Fund (a.k.a., pistol permit fund), resulting in the creation of non-civil

service positions. (*Id.*; pp. 115:1-116:20 (65% Fund); 119:5-14 (Mental Health Officer); 118:5—120:5 (Law Enforcement Account)).

69.    As of early 2017, the Sheriff lost the Federal Inmate Fund/65% Fund. (*Id.* at p. 117:22-23).

70.    And, beginning in 2019, the Law Enforcement Fund no longer existed because Alabama sheriffs lost the ability to collect fees from pistol permits.  (Doc. 55-2, p. 191:11-23).

71.    To avoid eliminating the previously created non-civil positions due to the loss of this funding, the Commission absorbed the costs and now pays for these positions, presumably out of the General Fund. (Doc. 55-2, p. 193:2-10)

72.    For example, the Commission approved and continues to pay the corrections captain wages, even though it was recently filled in 2024 by Falon Hurst, previously the patrol division lieutenant, because the previous correction captain was a non-civil service position. (Doc. 55-2, p. 226:5-23).

73.    The highest-ranking civil service employees in the department are the two corrections lieutenants. (Doc. 55-2, pp. 107:20-108:9).

74.    Some sergeants are civil service, while others are not. (*Id.*)

75.    There are 8 sergeants within the patrol division and 3 of them are civil service. (Doc. 55-2).

76.     Regardless of whether an employee is civil service or not, the Sheriff uses the same procedures in every employment process, from hiring to termination and everything in between. (Doc. 55-2, p. 108:16-21).

**B.      Sheriff Non-Civil Service Employees Rate of Pay**

77.     When Sheriff Wade became Sheriff in 2016, he, with the approval of the Commission, set the pay rate for all non-civil supervisor Sheriff employees at $10,000.00 below his salary of $87,000.00 and tiered it according to rank. (Doc. 55-2, p. 196:10-22).

78.     So, the following positions received the following pay at an hourly rate: (a) Sheriff - $87,000.00; (b) Chief Deputy - $75,000.00; (c) Captains - $65,000.00; and (d) Patrol/Enforcement and Investigations Lieutenants - $55,000.00. (*See Id.*)

79.     Unlike civil service employees, the non-civil service Sheriff employees are not entitled to any cost-of-living, yearly, or across-the-board increases that the Commission approved for all other civil service employees. (*Id.*, *see also Id.* at pp. 124:21-125:17).

80.     After submitting a written request to the Commission, and if approved by the Commission, the individuals in these positions could receive the 1.31% per year and any other across the board increases given to all civil service employees. (Doc. 55-2, pp. 131:6-132:3).

16

81.    For example, when the Commission approved an $0.86 per hour raise for civil service employees, they did not approve a raise for the Sheriff's non-civil service employees. (Doc. 55-2, p. 125:2-17).

82.    In addition, investigation division Lieutenant William Moses's hourly pay did not track the above amounts because he received additional income from the County's Mental Health Officer Board due to his service and additional duties as the Mental Health Officer. (Doc. 55-2, p. 210:4-19).

## VI.    Plaintiff's Rate of Pay as Corrections Lieutenant

83.    Mrs. Chames does not know: (a) how her rate of pay is determined; (b) whether her rate of pay is determined by the civil service pay scale; (c) how her years of service affects the rate of pay; (d) how many years of service she has; or (e) if she was correctly paid according to the pay scale. (Doc. 55-1, pp. 131:4-16, 133:6-134:5, 137:14-17. *But C.f.* Doc. 55-2, p. 138:19-23; *see also* Doc. 56-1, p. WADE_0343-44, § 10.6.1, § 10.6.4).

84.    She also does not know whether she has any reason to dispute that she was paid correctly according to the pay scale. (*Id.* at p. 145:5-16).

## VII.    Other Lieutenants & Supervisors

85.    Since Mrs. Chames became a full-time Corrections Lieutenant in April 2016, there have been two other concurrent Corrections Lieutenants, Judson

Blewster and Jordan Shekels (formerly known as Jordan Luker). (Doc. 55-1, p. 67:11-15).

86.    At the time Mrs. Chames was hired as a temporary corrections lieutenant in October 2015, Judson Blewster was also a corrections lieutenant. (Doc. 55-1, p. 68:10-21).

87.    When Blewster left the Sheriff's Office, Jordan Shekels, then a corrections sergeant, was promoted to corrections lieutenant. (Doc. 55-1, p. 69:13-15).

88.    These two individuals, both civil service employees, were paid according to the applicable pay scales and pay level thereon. (Doc. 55-3, p. 107:22-108:3).

89.    Ronnie Murray was a non-civil service patrol lieutenant and then an investigative lieutenant, but never a corrections lieutenant. (Doc. 55-1, p. 83:4-84:5).

90.    William Moses has held various positions within the Sheriff's Department and is currently non-civil service as the investigations division lieutenant and the mental health officer. (Doc. 55-2, p. 46:6-9).

91.    Falon Hurst is currently the Corrections Captain and does not have civil service status, but was previously the non-civil service patrol/enforcement division lieutenant.

92.     Joey Stone worked as an APOST certified, non-civil service patrol lieutenant from 2016 until 2019 when he was promoted to Captain of the patrol division. (Doc. 55-3, pp. 82:7-83:22).

## VIII. **Plaintiff's Alleged Reporting of Discrimination & Retaliation**

93.     Plaintiff is not aware of anyone in the Sheriff's office retaliating against a report of gender or race discrimination in the past. (Doc. 55-1, p. 144:6-10).

94.     Plaintiff does not know when the alleged pay disparity began. (Doc. 55-1, p. 138:18-23).

95.     Plaintiff does not know how long she knew about it before she reported it. (*Id.*, p. 139:1-3).

96.     Plaintiff first met with the Corrections Captain in 2018 regarding her "pay and how there was such a disparity between [her]self and other lieutenants." (Doc. 55-1, p. 85:7-21).

97.     The "other lieutenants" at the time were Ronnie Murray and Falon Hurst. (Doc. 55-1, pp. 85:22-86:5).

98.     During that meeting, Plaintiff reported the pay disparity and told the Captain that she is "the only black female lieutenant, and…I don't want to make these assumptions, but something is not right here." (Doc. 55-1, p. 110:4-23).

99.     The meeting concluded with Plaintiff stating that she would talk to other people about the pay disparity. (Doc. 55-1, p. 111:1-7).

100.    Plaintiff does not recall the next person she spoke to or when she spoke to them but does remember she spoke to both Sheriff Wade and the Chief Deputy at some point after her meeting with the Corrections Captain. (Doc. 55-1, pp. 112:8-113:13).

101.    When meeting with Sheriff Wade, Plaintiff reported the pay disparity, she did not think it was fair, and that she "fe[lt] it's illegal, what's being done." (Doc. 55-1, p. 114:1-9).

102.    According to Plaintiff, she recalls Sheriff Wade brought up the County Commission, that they are responsible for pay rates, and said she should speak with the Commission, specifically Fred Wilson, the chairman of the Commission, and Mark Tyner, the County Administrator. (Doc. 55-1, pp. 114:10-115:8).

103.    When Plaintiff met with the Chief Deputy, Plaintiff discussed her pay, Plaintiff being the only black female lieutenant, and the gap in what I was being paid versus what the other lieutenants were being paid. (Doc. 55-1, pp. 116:10-117:3).

104.    Plaintiff does not recall exactly what the Chief Deputy said in response but does remember him stating that he would try to help her as much as he could and brought up the Commission again. (*Id.*)

105.    After these meetings, the Sheriff did in fact raise the issue with the Commission Administrator, who informed the Sheriff that the Commission would

approve a $5,000.00 raise for Plaintiff but that she would have to become non-civil service. (Doc. 55-2, pp. 156:15-157:11).

106.    The Chief Deputy met with Plaintiff thereafter to offer Plaintiff the $5,000.00, along with an acknowledgement notifying her that she would no longer be entitled to civil service rights, protections, or raises for all employees. (Doc. 55-1, pp. 117:10-120:20).

107.    Prior to being presented with this acknowledgement, Plaintiff was not aware that an employee who is paid not solely from Commission funds is exempt from civil service. (*Id.*)

108.    Plaintiff, though, turned down the offer because, according to her calculations, she would be making $42,000.00 a year and it did not address the pay gap between her and the other lieutenants. (*Id.*)

109.    Plaintiff also alleges in the Amended Complaint that the other lieutenants at the time, Falon Hurst and Ronnie Murray, received a $10,000.00 raise that same year. *See* Amended Complaint, Doc. 9, p. 7, ¶ 51, but her only basis for the allegation is discussions she overheard between other employees at the Jail. (Doc. 55-1, p. 126:10-18).

## IV.    **EEOC Charges**

110.    On November 11, 2019, Plaintiff filed her first charge of discrimination with the EEOC, identifying the Commission as her employer. (*See* Doc. 28-1).

21

111.    The Commission filed a response to Plaintiff's first EEOC Charge on April 24, 2020, arguing that the Commission is not Plaintiff's employer and explaining that the reason for the pay disparity is due to non-corrections division lieutenants performing different and additional job duties and responsibilities. (*See* Doc. 28-2).

112.    Plaintiff filed a second EEOC Charge on July 6, 2020, with the same factual allegations except naming the Sheriff as an additional employer. (*See* Doc. 28-3).

113.    The Commission and the Defendant filed a nearly identical response on March 5, 2021, with the additional information that Plaintiff is paid at the accurate hourly rate according to the pay scale for corrections lieutenants along with all other corrections lieutenants who have been employed concurrent with Plaintiff's tenure. (*See* Doc. 28-4).

## ARGUMENT

## I.    Plaintiff's EPA Claims Fail As A Matter of Law.

In Counts 6 and 8, Plaintiff alleges that Defendant violated the EPA by paying alleged male comparators Falon Hurst and Ronnie Murray, both lieutenants in different divisions of the Sheriff's Department when Plaintiff filed her operative EEOC charge, a higher hourly rate of pay for performing the same job. *See* Doc. 9, ¶¶ 272-276, 366-370. The EPA prohibits wage discrimination on the basis of sex and

22

"forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992); 29 U.S.C. § 206(d)(1).

The Eleventh Circuit recently clarified that the proper analysis of an EPA claim involves only two-steps, not three. *See Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024). First, Plaintiff must establish prima facie by showing that Defendant paid "different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id.* (cleaned up). Second, if Plaintiff establishes a prima facie case, Defendant then bears the burden of proving the pay disparity is justified under one of four exceptions to the EPA: (1) "a seniority system;" (2) "a merit system;" (3) "a system which measures earnings by quantity or quality of production;" or (4) "a differential based on any factor other than sex." (*Id.* (cleaned up)). If Defendant meets his burden of production, Plaintiff is not required to show pretext, but, rather, may avoid summary judgment by pointing to a genuine dispute of material in the record. (*Id.* at 1320).

A plaintiff establishes a *prima facie* case under the EPA by comparing the jobs held by the female and male employees, and by showing those jobs are substantially equal, comparing only the skills and qualifications actually needed to perform the primary duties of each job. *See Miranda*, 975 F.2d at 1533. "The plaintiff need not

prove that the job held by her male comparator is identical to hers; she must demonstrate only that the skill, effort and responsibility required in the performance of the jobs are 'substantially equal.'" *Id.* (quoting 29 U.S.C. § 206(d)(1)). "The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) (finding that an insurance agent failed to raise a genuine factual issue that her comparators were substantially equal when she failed to rebut evidence that they were tasked with seven different important duties). *See also Terrell v. Ala. State Univ.*, 700 F.Supp.3d 1015, 1024 (M.D. Ala. 2023) (finding that a fellow employee was not a proper comparator in part because he only shared broad similarities between a small percentage of the comparator's job and the plaintiff's job).

### 1. Plaintiff fails to establish a prima facie case because there is no evidence Plaintiff's job was "substantially similar" to the other lieutenants.

Plaintiff compares herself to Falon Hurst, the patrol/enforcement lieutenant, and Ronnie Murray, the investigations lieutenant. *See* Doc. 9, Count 9.  Plaintiff fails to establish her prima facie case as to these jobs because (1) Plaintiff has not produced evidence of the skills or qualifications actually needed to perform the jobs of the other lieutenants, or the actual job content thereof, and (2) the other lieutenants perform different, additional duties in different jurisdictions.

First, Plaintiff cannot produce any evidence of the skills and qualifications actually needed to perform the jobs of patrol lieutenant, or investigations lieutenant. *See Blackman v. Fla. Dep't of Bus. & Pro. Regul.*, 599 F. App'x 907, 910 (11th Cir. 2015) (finding plaintiff failed to carry the burden of demonstrating jobs at issue were substantially similar where there was "almost no evidence regarding the 'skills qualifications actually needed to perform [the job at issue]" or the actual content of her job and the comparator job). There is simply no evidence in the record as to the requirements or qualifications for the job of investigative lieutenant. The only evidence of the qualifications and requirements for the patrol lieutenant job is that the individual must be APOST certified. (*See* ¶¶ 40-44, supra).

Similarly, there is no evidence as to the other lieutenants' "actual job content." To the extent Plaintiff testified, without any specifics, that the other lieutenants' jobs are similar in that all lieutenants are the same rank and are supervisors, (Doc. 55-1, 143:4-8), such conclusory testimony is insufficient to carry Plaintiff's burden or create a genuine issue of material fact. *Blackman*, 599 F. App'x at 910. Indeed, Plaintiff testified that she does not know the job duties of the investigation lieutenant, (Doc. 55-1, p. 84:6-14), or the patrol lieutenant, (*Id.* at pp. 53:13-54:7), and did not know the other lieutenants' supervisory duties, or how many subordinates they supervised. (Doc. 55-1, p. 84:6-14). In fact, Plaintiff testified that corrections

lieutenants do not have any job duties related to the other lieutenants' divisions, and does not directly supervise sheriff's deputies. (*See* ¶¶ 56, 58 supra).

In contrast, the available evidence demonstrates the other lieutenants performed additional, significant, different duties than that of corrections lieutenants like Plaintiff. The other lieutenants were required to be APOST certified so they could perform arrests; Plaintiff, on the other hand, did not have arrest powers and would have to be supervised by a deputy in order to perform an arrest. (Doc. 55-2, p. 174:4-12; Doc. 56-4, § 36.100)

Moreover, the jurisdiction of the lieutenants differ. The patrol and investigations divisions extend to the geographical boundaries of the Calhoun County; while the corrections division jurisdiction is limited to all persons booked into the county jail. (Doc. 55-1, p. 179:3-13; *see also* Doc. 56-4, p. WADE_0468) These additional duties and geographical responsibilities preclude Plaintiff from establishing a prima facie case under the EPA. *See Waters v. Turner, Wood & Smith Ins. Agency, Inc.,* 874 F.2d 797, 799–800 (11th Cir. 1989) (no substantial similarity between "inside" and "outside" sales jobs); *Pruitt v. Universal Prot. Serv., LLC*, No. 23-13239, 2024 WL 4971993, at *3 (11th Cir. Dec. 4, 2024) (jobs not substantially equal where most of plaintiff's responsibilities confined to one hospital while comparators were responsible for more than one hospital).

### 2.    Factors Other Than Sex Account for Different Pay Rates

Even assuming Plaintiff can establish her prima facie case, there is affirmative evidence in the record demonstrating that the pay differential between Plaintiff and the other lieutenants is based on a factor other sex. The "factor other than sex" exception applies when a pay disparity "results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988). Even subjective "business reasons" may be sufficient so long as they are susceptible to some objective evaluation. *See Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011 (11th Cir. 1984) (noting, in a Title VII case, that "[t]he reason that the defendant offers in this case, although somewhat subjective, is not so incapable of objective evaluation as to render it inadequate to meet the defendant's burden of rebuttal").

There is no doubt that the other lieutenant positions require different, additional experience, training, or ability compared to the corrections lieutenant position. Plaintiff is not qualified to be a deputy lieutenant within the patrol division. (Doc. 55-2, 160:17-21). APOST certification is a 16-week course required for the lieutenant and investigations divisions and APOST certified individuals must engage in continued learning to remain certified. (Doc. 55-2, 259:2-15) Plaintiff has not completed this course and is not required to in order to perform her job as a corrections lieutenant. (Doc. 55-1, 81:23-82-1). As Plaintiff testified, there is no

27

reason for her to be APOST certified because the arrestees or inmates are already in custody when they arrive at the jail. (Doc. 55-1, 165:14-17). Indeed, the correctional equivalent of APOST—APOST-C—is not even available to county corrections employees, only to state corrections employees. (Doc. 55-2, pp. 258:2-10).

In addition, the geographic scope and responsibilities of patrol and investigations division employees are greater than those in the corrections division, who are primarily confined to the jail. (*C.f.* ¶ 52, supra, *with* ¶ 53, supra; *see also* ¶ 62, supra).  The other lieutenants' job goals are to prevent crime, investigate it, and then apprehend offenders, while Plaintiff's duties begin only after the deputies or investigators bring the offender to the jail for booking. (Doc. 55-1, 34:13-17, 165:14-17).

There is objective evidence, such as the civil service rules, regulations, and pay scales, to support the decision to pay the other lieutenants more too. APOST certified civil service deputies are paid at at a step on the pay scale commensurate with the number of years of the deputy has served as an active certified law enforcement officer. (Doc. 56-1at WADE_0-344, § 10.6.6). On every civil service pay scale in the record (2016-2023), sheriff's deputies within the patrol division are paid higher than corrections officers. (Doc. 56-1, WADE_0342-0343, §§ 10.5.1, 10.6.1) In fact, every position in the patrol division is paid at a higher rate than their counterparts in the corrections division. (*See* ¶ 23, supra). These pay rates are not

determined by the Sheriff but are instead the result of a collaboration between the Commission and the Civil Service Board which classifies each job according to the skills, requirements, duties and responsibilities. (Doc. 56-1, WADE_0344, § 10.7).

The increased pay reflects the additional requirement, qualifications, and impact on public safety that patrol and investigations division employees, including the other lieutenants, have as compared to their counterparts in the corrections division. Similarly, Sheriff Wade may set the pay rate for non-civil service patrol and enforcement lieutenants to reflect these non-sex based factors. *See Baker v. Upson Reg'l Med. Ctr.,* 94 F.4th 1312, 1321 (11th Cir. 2024) (fact that plaintiff disagreed with employers higher valuation of experience was irrelevant because "[u]nder the [EPA], the courts…are not permitted to substitute their judgment for the judgment of the employer.").

Accordingly, Defendant is entitled to summary judgment as to Plaintiff's EPA claim because she cannot establish a prima facie case and, in the alternative, any pay difference is based on factors other than sex.

## II. Plaintiff's Title VII, § 1981, and § 1983 Claims Fail As A Matter of Law.[2]

---

[2] This section uses Title VII, §§ 1981 and 1983 interchangeably as the elements for each claim are the same and these claims are based on the same facts. When a Title VII claim is based on the same facts as a § 1981 or 1983 claim, the analysis is the same under all theories of liability, and the claims need not be analyzed separately. *Lindsey v. Bd. of School Com'rs of Mobile Cnty.*, 491 F. Appx. 8, 9 (11th Cir. 2012). Because Plaintiff's Title VII pay discrimination claims fail, so too must her §§ 1981 and 1983 claims. *See Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982).

There is no direct evidence of discrimination in the record. Therefore, to survive summary judgment, Plaintiff must present circumstantial evidence of intentional discrimination sufficient for a jury to rule in her favor under the *McDonnell Douglas* burden-shifting framework or establish a "convincing mosaic" of such evidence. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Plaintiff cannot produce sufficient evidence to satisfy either method.

Under the *McDonnell Douglas* framework, Plaintiff must first make out a prima facie case of discrimination, that is she must show "that she was a qualified member of a protected class and subjected to an adverse employment action in contrast to similarly situated employees outside the protected class." *Reddy v. Dep't of Educ., Ala.*, 808 F. App'x 803, 811 (11th Cir. 2020). This higher paid employee must be sufficiently similar to Plaintiff in all material respects. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019). A similarly situated comparator will (1) have engaged in the same basic conduct as the plaintiff; (2) will have been subject to the same employment policy or guidelines; (3) will have been working under the same supervisor; and (4) will share the plaintiff's employment or disciplinary history. *Id.* at 1227-28. When determining whether an individual is a proper comparator, federal courts examine, inter alia, the amount of years an individual has worked for the employer and the individual's type of expertise. *See Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008). "If a plaintiff fails to show the existence of a similarly

situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1224-25.

Plaintiff cannot meet her initial prima facie burden of presenting a similarly situated non-African American or male comparator. As an initial matter, Plaintiff cannot produce evidence showing that any individuals occupying the roles of patrol or investigations lieutenants, including those identified in her Amended Complaint (Hurst and Murray), are similarly situated to herself. In contrast, the record shows that these individuals are not subject to the same employment policies or guidelines, such as the Civil Service Guidelines, the same SOPs in the Sheriff Department Standard Operating Procedures, or, obviously, Jail Procedures, (*see* Docs. 56-1--56-12). Any non-correctional lieutenants performed different, additional duties, such as patrols, performing arrests, criminal investigations, and serving warrants, all outside the confines of the jail, and required different education and experience, i.e., APOST certification. Plaintiff was not APOST certified and could not perform many of these duties. Moreover, the other lieutenants were not subject to the same supervisors, as Plaintiff reported to the corrections division captain, while the other lieutenants reported to the captains of their respective divisions. Therefore, the non-corrections lieutenants are not similarly situated to Plaintiff or other corrections lieutenants.

Even if the non-corrections lieutenant individuals were proper comparators, though, the pay disparity is based on the additional duties, responsibilities, qualifications, and certifications that have been identified above. Indeed, APOST certification requires passage of a 16-week training course and continued education to maintain certification. Plaintiff did not complete this course as compared to the proffered comparators and was not required to do so as a corrections division employee. Plaintiff does not allege or produce any evidence that the decisions to pay non-corrections lieutenants at a higher rate was pretextual in any way.

Thus, the only true comparators are the individuals who served as corrections lieutenants concurrently with Plaintiff—Shekels and Blewster. These individuals were in the same position, performed the same duties, held the same responsibility, and were subject to the corrections captain. Any pay differential is attributable to the bona fide seniority classification system reflected in the applicable pay scales and implemented by the Board and Commission. There is no allegation or evidence that Plaintiff or any civil service co-employee were not paid according to the pay scale in affect for that year, or that the differential was motivated by pretext.

Alternatively, Plaintiff fails to produce evidence of a "convincing mosaic" that would allow a jury to infer intentional discrimination in her rate of pay by Sheriff Wade, the Board, or the Commission. *See Smith*, 644 F.3d at 1328. That is, Plaintiff cannot produce evidence of (1) suspicious timing, ambiguous statements, or other

information inferring discriminatory intent; (2) systematically better treatment of similarly situated employees; or (3) pretext. *Lewis*, 934 F.3d at 1185. The reasons for paying non-corrections lieutenants and other supervisors outside the corrections division higher rates of pay has been detailed above. There is no allegation or evidence in the record suggesting this was pretext. Moreover, there is no evidence of systematically better treatment of similarly situated non-African American or male employees. Indeed, Patrol Captain Marcus Wood, an African-American male, was a non-civil service employee, and Jordan Shekels, a white female, was hired as a civil service corrections lieutenant and paid according to the applicable pay scale and level thereunder.

In addition, there is no evidence of suspicious timing regarding compensation decisions, ambiguous statements, or other information to create a convincing mosaic. In fact, there is no evidence that any compensation decisions were based on sex or race. In sum, there is no evidence sex or race played a role in compensation decisions among the Sheriff's employees.

Considering these facts together, Plaintiff cannot satisfy the *McDonnell Douglas* framework or present a convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination in the context of her compensation. In addition, Plaintiff cannot show the legitimate, non-discriminatory reason for the disparity was pretextual. Accordingly, Defendant is entitled to

summary judgment as to Plaintiff's Title VII, § 1981, and § 1983 discrimination claims.

### III.    Plaintiff's § 1981 Retaliation Claim Fails As A Matter of Law.

Plaintiff alleges that she engaged in a statutorily protected activity by reporting race and gender discrimination to her supervisors, suffered an adverse employment action in the form of being offered one-time raise of $5,000.00 while forgoing her civil service status, and her complaints were the but-for cause of the Department's alleged retaliatory offer of the raise. *See* Doc. 9, pp. 19-20. Like Title VII claims, § 1981 claims of retaliation may be proven using the *McDonnell Douglas* or convincing mosaic approach. Ultimately, Plaintiff has the ultimate burden of showing a retaliatory motive was the but-for cause of the adverse action."

First, there is no evidence Sheriff Wade offered Plaintiff the raise. Instead, the evidence shows that the Sheriff could not unilaterally offer the raise and, it was the Commission, not the Sheriff who offered the raise. Therefore, Defendant took no retaliatory action with regard to Plaintiff. This is particularly true when it is the *amount* of the raise, not the raise itself, that Plaintiff took issue with and was solely in the control of the Commission.

Second, the offer of a raise was not a materially adverse action—one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Smith v. city of Ft. Pierce, Fla.*, 564 F. App'x 774, 777-78 (11th Cir.

2014) (cleaned up). Plaintiff testified that the reason she did not accept the raise is because it was not sufficient to raise her pay to that of the other lieutenants, not the requirement that she waive her civil service status and rights thereunder. A raise, though, is not adverse.

Third, Plaintiff cannot establish a causal link between the raise and her alleged protected activity. Specifically, there is no evidence Sheriff ever knew Plaintiff claimed that the alleged pay disparity was based on her gender or race prior to the offer to raise Plaintiff's pay. *See Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (causal connection requires showing decision-maker was aware of the protected conduct). When Plaintiff met with Wade, she only reported her pay wasn't fair and that she "fe[lt[ it's illegal what's being done." (Doc. 55-1, 114:1-9).

Last, Plaintiff cannot establish her protected activity was the but-for cause of the $5,000.00 offer. To be sure, it was the amount, not the raise itself that Plaintiff felt was adverse. But there is no evidence that the Sheriff nor the Commission's authorization of the raise or amount was motivated by the Plaintiff's alleged protected activity. Similarly, Plaintiff cannot establish any action by the Sheriff or the Commission was pretextual.

## CONCLUSION

For the reasons stated above, Defendant requests summary judgment on all of Plaintiff's claims.

35

Respectfully submitted, this 11th day of February, 2025.

/s/ *W. Jackson Britton*
W. JACKSON BRITTON (8252-K46Y)
C. RICHARD HILL, JR. (0773-L72C)
*Attorneys for the Defendant*

OF COUNSEL:
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069
Telephone: (334) 241-8043
Facsimile:(334) 241-8243
rick.hill@chlaw.com
jackson.britton@chlaw.com

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of February, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record (and by U.S. Mail to non-CM/ECF participants) as indicated below:

Blake Clifton Edwards
Nicole Davis Edwards
**EDWARDS & EDWARDS**
   **ATTORNEYS AND MEDIATORS, PLLC**
3603 Pine Lane SE, Suite C
Bessemer, AL 35022
blake@edwardsattys.com
nicole@edwardsattys.com

/s/ *W. Jackson Britton*
**OF COUNSEL**

37