FILED

2025 Mar-06  PM 06:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **LATONYA CHAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:21-CV-1571-CLM** |
| | ) | |
| **SHERIFF MATTHEW WADE** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## PLAINITFF'S BRIEF IN OPPOSITION OF DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Blake C. Edwards, Esq.
Nicole D. Edwards, Esq.
EDWARDS & EDWARDS ATTORNEYS AND MEDIATORS, PLLC
3603 Pine Lane SE, Suite C
Bessemer, AL 35022
Tel: (205) 529-4637
Email: blake@edwardsattys.com
          nicole@edwardsattys.com
*Counsel for Chames*

## **TABLE OF CONTENTS**

I.    RESPONSE TO WADE'S STATEMENT OF FACTS………………..1

II.   ADDITIONAL UNISDPUTED FACTS……………………………..12

III.  ADDITIONAL DISPUTED FACTS…………………………………...15

IV.   ARGUMENT………………………………………...…………18

    A. Genuine disputes of material fact exist as to Chames'
    Title VII, §1981, and §1983 claims…………………………………19

          i.  Wade vs. The Calhoun County Civil
          Service System……………………………………………20

          ii.  Wade's discriminatory pay offer………………………….22

    B. Genuine disputes of material fact exist as to Chames'
    §1981 Retaliation claim……………………………………………..25

    C. Genuine disputes of material fact exist as to Chames'
    EPA claims……………………………………………………………29

    D. Chames' Lilly Ledbetter Fair Pay Act claims………………………31

V.    CONCLUSION……………………………………………………33

## I.    <u>RESPONSE TO WADE'S STATEMENT OF UNDISPUTED FACTS</u>

3.    Disputed as to the incorrect citation of Sheriff Wade's entire deposition.

12.    Disputed. Every employee in the sheriff's office, regardless of civil service status is supposed to receive a 1.31% per year annual living increase from the civil service fund at the Sheriff's discretion.

15.    Denied. Chames was told by Chief Deputy Meeder not to nickel and dime the Sheriff's department for overtime for answering her work telephone 24 hours a day and 7 days a week. (Doc. 62-8).

16.    Clarified in part. See *Id*. at 12.

17.    Disputed. Neither the Civil Service Board or the Commission have the authority to dictate to Wade how he spends funds. (Doc. 55-3, at 31:8-11).

20.    Disputed. See *Id* at 12.

21.    Disputed. The Defendant cannot put relevance arguments in its undisputed fact section of its brief[1].

22.    Disputed.  When Wade became Sheriff in 2016 he set the Chief Deputy's pay at $75,000 per year at $75,000, patrol captain at $65,000, per year and then the deputy lieutenants are set at $55,000 per year. (Doc. 55-2, at 140:2-14).

---

[1] This is a constant theme throughout the brief. The Defendant puts disputed facts and arguments in its undisputed fact section of its brief.

Ronnie Murray and Falon Hurst's pay was set by Wade at $55,000 per year. (Doc. 55-2, at 140:2-14).

27.    Clarified in part. Corrections officers can patrol inside and outside of the jail to suppress crime. (Doc. 55-1, at 175:17-176:5).

30.    Disputed. Chames' LPN contract was never executed, due to a notary's expired commission date on the document. (Doc. 55-2, at 175:16-178:10).

31.    Denied. The LPN contract is not valid, improperly citing Chames' entire deposition and as to Defendant's rationale that is not undisputed facts.

32.    Denied. This paragraph contains no citation to the evidentiary record.

33.    Denied. This paragraph contains no citation to the evidentiary record. This statement is misleading. Sheriff Amerson hired Chames in 2015 as a temporary Lieutenant and as a full time Lieutenant in April of 2016. Sheriff Amerson did not resign until September 30, 2016.[2]

34.    Disputed that this was a civil servant position when Chames was hired as a corrections lieutenant in 2015 and April 2016. On February 8, 2016, the Civil Service Board had its first quarterly meeting. On February 9, 2016 the Chairman of the Civil Service Board wrote the Calhoun County Commission to let them know

---

[2] https://www.wbrc.com/story/33167881/calhoun-county-sheriff-larry-amerson-announces-retirement/

that there were zero civil service Lieutenant positions in the Sherriff's department to promote Lynde Meeder from Sergeant to Lieutenant. (Doc. 62-3, at ¶2).

37.     Clarified in part. Chames can indirectly supervise enforcement sergeants and deputy sheriff's (Doc. 55-1, at 80:15-81:3).

38.     Disputed in part. Deputizing an employee makes them the alter ego of the sheriff. (Doc. 55-2, at 173:5-174:3). A deputized employee can sign the Sheriff's name to documents, acts in his stead, and could be seen as giving that employee all the powers of the sheriff. (Doc. 55-2, at 170:2-174:4.). Chames swore under oath that she was deputized and has a certificate that she is a deputy. (Doc. 169:16-171:15).

39.     Disputed. *Id*. at ¶38.

40.     Disputed. A correctional officer can serve warrants, make arrests and go out on patrol. (Doc. 55-1. at 78:13-19). Sheriff Wade deputized Chames. (Doc. 169:16-171:15).

41.     Admitted in part. Chames has never been offered APOST Certification even though she has been deputized. (Doc. 55-1, at 165:9-17).

43.     Disputed[3]. A correctional officer can serve warrants, make arrests and go out on patrol. (Doc. 55-1. at 78:13-19).

---

[3] Defendant's Doc. 56-4, referenced in its Summary Judgment Brief ¶43, ¶52, ¶53 and its argument appeared in 2021 after Chames filed both EEOC charges and lawsuits against the Calhoun County Commission and Sheriff Wade.

44.     Disputed. Chames carries a firearm and is allowed to use deadly force if necessary. (Doc. 55-1, at 158:9-18).

45.     Disputed/Objection to the Court taking judicial notice of Wade's appointment date because the month and day of when he was appointed in 2016 are not clear based on this paragraph 45. Wade was appointed on October 1, 2016 after the retirement of Sheriff Larry Amerson. (See Footnote #2).

52.     See denial in ¶27.

55.     Denied. As a Correctional Lieutenant, Chames is on call 24 hours a day and 7 days a week via her work telephone. (Doc. 55-1, at 151:4-10).

56.     Clarification. Chames said she did not. Chames did not say speak as to all correctional lieutenants.

59.     Clarification. This citation had to do with Josh Dogrell's job not to all patrol lieutenants.

60.     See denial in ¶59.

61.     Objection and denial as to the Defendant's explanatory reasoning in the undisputed fact section of its brief.

62.     Denial as to misleading. Chames says in some ways they differ, but both make arrests (Doc. 55-1, at 76:12-77:1).

63.     Clarification. Chames was asked about Lt. Moses job, not all investigative lieutenants.

65.    Denied as to improper citation to the evidentiary record.

67.    Denied as to mischaracterization of the Sheriff's monologue.

68.    Admitted in part. Additionally, there is a Corrections Account which is funded by bail bonds fees and other sources. (Doc. 55-2, at 118:21-119:4).  Then there is the Sheriff's Law Enforcement discretionary funds. Wade's signature is on a document dated June 30, 2023, in which he states he will utilize the Sheriff's Law Enforcement discretionary funds to pay for a supplemental wage increase for Chief Deputy Lynde Meeder, Captain Joey Stone, and Lieutenant Falon Hurst. (See Wade_4555, Doc. 62-1) Wade is asking that he be sent an invoice from the Commission to pay for the pay increase. (Wade_4555, Doc. 62-1).  (Doc. 55-2, at 119:15-120:1).

69.    Disputed. The Commission is not able to see what specific fund Wade pays Sheriff's employees. (Doc. 55-3, at 67:15-68:8). Sheriff's employees still got paid by the commission.

70.    Disputed. (See *Id.,* at ¶69).

71.    Objection to "presumably out of the General Fund." There is some dispute as to whether the Commission has paid this cost to non-civil servants because Wade testified, "The commission would bill me for that, but I think they only billed me a couple of times, and they just absorbed it. They now pay it themselves as far as I know." (Doc. 55-2, at 193:2-8). Wade is not completely sure where the funding

is coming from. Amanda Draper testified, I don't think we would be able to see what fund they get paid out of from our invoicing.  And then payroll department, we don't see on our side, you, what funds those come out of because it's at the sheriff's department. So he should be able to provide you those documents with what funds those come of when he goes to pay those invoices." (Doc. 55-3, at 67:15-68:8).

72.    Disputed. In 2024, Hurst (white male) was a 14 year employee (Doc. 55-2, at 229:6 – 230:15). According to the 2022 pay scale (last pay scale provided), Hurst should have made $2,107.72 per pay period or $54,800.72 ($2,107.72 x 26 pay periods a year) per year (Doc. 56-18, at Wade_4177, column 14, row 3). However in 2024, Wade recommended to the Commission that Hurst be paid $76,232 per year. "Where did you get the number $76,232? A: "It would be from the commission talking to them about what he made and what the other jail administrator made and what the salary should be. I can't remember the calculations they gave me, but they had calculation that they said they approved to." (Doc. 55-2, Ex. 25 pg. 1 & Doc. 55-2, at 225:12 - 226:21). In fact in 2024 Hurst made $77,928.46. (Doc. 62-4, at p. 6).

75.    Objection. There is no line citation to this alleged undisputed fact.

76.    Clarified in part. Sheriff Wade testifies, "What I try to do is, no matter what on my end, the disciplinary end or hiring or disciplining somebody, we do the some (sic)." "We have the same procedures, and the procedures we use in this

6

whether they're civil service or not." (Doc. 55-2, at 13-21). Civil service employees are afforded a hearing before receiving discipline and are not considered at-will employees. (Doc. 55-3, at 26:8-27:1).

77.    Disputed. On two different occasions regarding this topic, Wade never testifies that he set the salaries "with the approval of the Commission." He said that he set the salaries himself. (See Doc. 55-2, at 140:2-14 & 196:10-22). Also worth noting former Sheriff Amerson retired effective September 30, 2016[4]. Sheriff Wade took the office on October 1, 2016.

78.    Disputed. Wade never specifies which Lieutenants (from which divisions) he set the pay for at $55,0000. (Doc. 55-2, at 196:10-22).

79.    Disputed. Wade testifies, "Everybody's supposed to get that regardless of your performance or anything else. On you anniversary date every year, you get that 1.31 (raise). Even non-civil service employees. (Doc. 55-2, at 193:18 – 195:13).

80.    Disputed. Civil service and non-civil service employees get the 1.31% cost of living raise per year. (Doc. 55-2, at 195:8-13).

81.    Disputed. Civil service and non-civil service employees get the 1.31% cost of living raise per year. (Doc. 55-2, at 195:8-13).

---

[4] https://www.wbrc.com/story/33167881/calhoun-county-sheriff-larry-amerson-announces-retirement/

82.    Disputed in part. This cited portion of Wade's testimony does not confirm that Moses was not given the $0.86 per hour wage increase. This testimony just states he was given an additional $15,000 in or around October 28, 2019. (Doc. 55-2, at 210:4-19; 208:4-211:19). However in 2017 before he was working with mental health, Moses worked with the Sheriff's office for 7 years and made $50,315.60. (Doc. 62-6 & Doc. 56-18, p. 4). His pay scale position, deputy, only allowed him $1,427.89 bi-weekly or $37,125.14 per year. (Doc. 62-5). In 2018 before he was working with mental health, Moses had worked with the Sheriff's office for 8 years and made $51,423.92. (Doc. 62-6 & Doc. 56-18, p. 4). His pay scale position, deputy, only allowed him $1,452.39 per bi-weekly check or $37,762.14 per year. (Doc. 62-5).

83.    Disputed. Chames does know that she was offered a one time raise of $5,000 for the rest of her tenure if she would agree that she would not receive any future raises and forgo her status as a civil service employee. (Doc. 55-1, at 117:17 – 119:4).

84.    Disputed. Chames testifies if you pick and choose who is on or off the pay scale, "your making the decision whether to abide by the pay scale or not, then yeah, it could become discriminatory. If I say white male, you have to, and black female, you have to, then yeah, I would say so." (Doc. 55-1, at 147:8-17). Chames, the only black female in a position of Lt. or higher for the Defendant ever, was paid

almost exactly as the pay scale for a Corrections Lt. in (Doc. 58-13) compared to her paycheck stubs in (Doc. 58-23).

85.    Disputed. There was a time frame between Blewster (white male) and Luker/Shekels (white female) (Doc. 52-2, at 143:2-6) that Chames did both jobs by herself with no additional pay for over a year. (Doc. 55-1, at 149:15-150:23).

87.    Highly disputed.[5] There was a time frame between Blewster (white male) and Luker/Shekels (white female) that Chames did both jobs by herself with no additional pay for over a year. (Doc. 55-1, at 149:15-150:23). Luker/Shekels was not promoted to Corrections Lt. until December of 2019 (Doc. 62-7), after Chames filed her first EEOC charge with the Calhoun County Commission in November of 2019. (Case No. 1:20-cv-01826-ACA, Doc. 1-1). (Doc. 55-1, at 159:22-160:4).

88.    Highly disputed and mischaracterization. Lt. Blewster (white male) (Doc. 55-2, at 144:10-19), in corrections resigned from his position as Assistant Mental Health Officer as of October 25, 2019. (Wade_4449, Doc. 62-2). This is similar to Moses being the mental health officer for Calhoun County in addition to his other police duties. (See Doc. 55-2, at 210:4-11). Moses' salary increase came from the mental health board. (Doc. 55-2, at 211:11-20).   This means that Correctional Lt. Blewster would not be a civil servant if he was not paid exclusively

---

[5] There are many of the Defendant's "undisputed" facts that are highly disputed by the Plaintiff and subject to FRCP 11 violations and sanctions.

from civil service funds or the General Fund. (See Doc. 55-2, at 111:23-112:11). Wade said, "the mental health officer fund that is established by law, and there's a board that pays for a mental health officer." (Doc. 55-1, at 15:23 – 16:12). Since her appointment to Lt. on December 16, 2019. Shekels has always been paid more than Chames: In 2020 Shekels made $52,670.01 and Chames made $41,345.41; In 2021 Shekels made $51,426.83 and Chames made $45,946.44; In 2022 Shekels made $54,835.93 and Chames made $47,428.88; In 2023 Shekels made $58,838.91 and Chames made $50,417.50; In 2024 Shekels made $60,640.34 and Chames made $52,875.14. (Doc. 62-4, at p. 1 & 8).

93.    Disputed as to a mischaracterization. Chames was a full time Lieutenant before Sheriff Wade was appointed Sheriff in 2016. In Sheriff Wade's tenure as sheriff, there has only been one black male (Woods) and one black female (Chames) that have had the rank of Lieutenant or higher. (Doc. 51-1, at 161:14-162:17). Chames claims that she is financially oppressed by Sheriff Wade every time she receives a pay check knowing what other Lieutenants are being paid much more. (Doc. 55-1, at 154:12-20).

94.    Disputed. Chames does know that she went to then Captain Eric Starr in 2018 to complain about pay disparity based on race and gender. (Doc. 55-1, at 109:18-110:23).

95.    Disputed in part. *Id* at ¶ 94.

96.    Clarified in part. See *Id* ¶¶ 94-95. In addition Skekels was making more than Chames in 2017-2019 as a correctional officer than Chames was as her boss, a correctional lieutenant. (Doc. 62-4, p. 1 & 8). Correctional Lt. Blewster was getting paid by the mental health board in addition to his earnings at the commission and was a non-civil service employee. (See Doc. 55-2, at 111:23-112:11). (Wade_4449, Doc. 62-2).

99.    Clarified in part and incorrect citation in part. Starr told Chames his hands were tied and he could not do anything about her pay disparity. (Doc. 55-1, at 109:18-110:23).

102.    Admitted in part. Wade told Chames that the County Commission was not paying people correctly. (Doc. 55-1, at 114:10-20). Disputed in part. Wade told Chames he was going to increase her pay to an amount comparable to the white male Lieutenants. (Doc. 9, ¶ 40). In May 2019, Wade informed Chames that he would only increase her salary by $5,000 per year. (Doc. 9, at ¶ 41).

105.    Clarified in part. Chames was told if she took the $5,000 raise she would never get another raise again. (Doc. 51-1, at 118:9-18). If accepted, Sheriff Wade would have given Chames the one time $5,000 raise out of the discretionary fund and she would no longer be a civil service employee. (Doc. 51-1, at 118:19-119:11).

106.    Disputed. The acknowledgment stated she would waive her right <u>to all future raises</u> (not just across the board raises for all employees) and the sheriff would be paying the $5,000 out of a discretionary fund.  (Doc. 55-1, at 118:9-119:1).

## II.    CHAMES' ADDITIONAL UNDISPUTED FACTS

1.    Per Wade, the highest ranking civil servant at the Sheriff's office are the two jail lieutenants. (Doc. 55-2, at 107:20:-108:3).

2.    The Commission "held the checkbook" for the Sheriff's 65% Federal Inmate Fund, and if Wade wanted to use the funds he had to request it from the Commission. (Doc. 55-2, at 116:3-14).

3.    If an employee of Wade's works overtime then they should receive pay for that overtime. (Doc. 55-2, at 134:2-7).

4.    Wade is a Constitutional officer for the State of Alabama that does not have a boss. (Doc. 55-2, at 137:13-138:4).

5.    There are currently no African-American sergeants on staff with the Sheriff's Office. (Doc. 55-2, at 154:15-18).

6.    There are currently no other African-American lieutenants on staff with the Sheriff's Office. (Doc. 55-2, at 154:19-21).

7.    There are currently no African-American captains on staff with the Sheriff's Office. (Doc. 55-2, at 154:22-155:4).

8.     Wade admits talking with County Administrator, Mark Tyner about Chames legal claims. (Doc. 55-2, at 156:15-19).

9.     When asked if Wade's employees that are not civil service still receive annual pay increases from the civil service commission, Wade responds, "Most of them do, you know…it's complicated." (Doc. 55-2, at 158:4-17).

10.     Wade admits that Commissioner Fred Wilson told Chames that if she likes her job she should dismiss her lawsuit. (Doc. 55-2, at 158:18-159:12).

11.     Wade does not sign certain documents that clearly bear his signature. (See Doc. 55-2, at 1852-185:18 & Doc. 58-40, at 6). Wade thinks a clerk signed his name, even though clerks are not deputized. (*Id.*)

12.     Sheriff's employees who are non-civil service positions are supplemented or funded by Wade's funds he maintains separately from the Commission or Civil Service Board. (Doc. 55-3, at 29:15-30:11).

13.     Neither the Civil Service Board or the Commission have the authority to dictate to Wade how he spends funds. (Doc. 55-3, at 31:8-11).

14.     Wade has the authority to categorize his employees as contract employees by making them sign contractual employee agreements. (Doc. 55-3, at 43:3-12).

15.    Every employee (with the exception of contract employees) receives a cost of living percentage from the Commission regardless of civil service status. (Doc. 55-3, at 47:15-48:1).

16.    A non-civil servant of the sheriff's office can be paid out of multiple funds that are not tied to the General Fund. (Doc. 55-3, at 50:10-23).

17.    A non-civil servant is paid a base rate but can be paid more from the sheriff's own funds. (Doc. 55-3, at 50:1-7).

18.    The Commission pays a portion of a non-civil servants wages, if Wade sends the Commission an invoice. (Doc. 55-3, at 84:6-85:11). The invoice relates to the supplemental wages. (Doc. 55-3, at 85:12-14).

19.    Commissioner Fred Wilson told Chames that filing an EEOC charge would possibly create a hostile work environment for her at the Sheriff's Department. (Doc. 55-1, at 156:17-157:3).

20.    Wilson said since he was the only black person at the Commission that he didn't want to rock the boat too much by helping Chames with her pay disparity. (Doc. 55-1, at 155:19-157:10).

21.    When Chames asked about getting paid overtime for answering her work phone on a 24 hour and 7 day a week basis, Chief Deputy Meeder told her "if you don't nickel and dime us, we won't nickel and dime you." (Doc. 55-1, at 141:4-142:10).

## III.    **ADDITIONAL DISPUTED FACTS**

22.    Lynde Meeder (white female) was promoted from Sergeant to Lieutenant on January 11, 2016. (Doc. 55-2, at 154:22-155:1). (Doc. 55-55, Wade_4567- 4568.). She was paid out of the Sheriff's 65% Federal Inmate Fund and was not a civil servant. (*Id.*). She received an increase in salary from $1,895.05 to $2,152.29  per month in January 2016. (*Id.*) On February 9, 2016, Sheriff Larry Amerson, writes a letter to the Commission stating that no Civil Service Position's existed for a Corrections Lieutenant. (Doc. 55-8). In 2017-2018, Lynde Meeder made approximately $26,000 more in gross pay than Chames. (Wade Ex. 2, pp. 1-2).

23.    Wade claims that when he is writing letters to the commission for pay increases, he is doing so at the direction of the commission because, "I can't spend the money without them giving me permission." (Doc. 55-2, at 131:9-22).

24.    Draper testifies that the different Calhoun County agencies that the Commission works with all have their own funds in which they receive money from the State of Alabama. (Doc. 55-3, at 40:16-41:1). "So if they wanted to use those funds for their employees, they could depending on, you know, whatever the state says they have to use those funds for or grants that they may get." (Doc. 55-3, at 41:1-8).

15

25.     Wade disputes the fact that Chames complained to him about race, gender, and pay discrimination. (Doc. 55-2, at 114:11-21).

26.     Wade denies offering Chames a $5,000 raise and telling her that if she took the raise she would forego her ability to receive future raises. (Doc. 55-2, at 123:6-124:10).

27.     Wade disputes all of the allegations in Chames' complaint. (Doc. 55-2, at 127:23-128:2).

28.     Wade denies that he has the ability to set the salaries of his employees. (Doc. 55-2, at 130:13-132:5).

29.     Wade disputes that Chames was told she could not submit overtime requests for payment. (Doc. 55-2, at 136:1-8).

30.     Wade says he believes Mark Tyner told him about offering Chames $5,000 and if she took it she would lose civil service status. (Doc. 55-2, at 156:20-157:11).

31.     Wade denies personally speaking with Chames about the $5,000 raise and losing civil service status. (Doc. 55-2, at 157:9-13).

32.     Wade denies knowledge of Chames gladly waiving her right to be a civil service employee if she could have gotten a $5,000 raise plus continual annual raises. (Doc. 55-2, at 160:3-16).

33.    Wade claims that the sheriff cannot enter contracts that obligate the county to pay money. (Doc. 55-2, at 177:1-5).

34.    Wade says in 2019 when he promoted Joey Stone to lieutenant he adjusted his salary to $65,000. (Doc. 55-2, at 195:23-196:7). His rational for doing so was to adjust everyone $10,000 below each level. (Doc. 55-2, at 196:8-13). He made around $87,000, then he set the chief deputy's pay at $75,000, captains $65,000, and lieutenants were $55,000. (Doc. 55-2, at 196:8-15). Wade claims he can't control pay now because he lost the 65 percent Sheriff's inmate fund. (Doc. 55-2, at 196:16-22).

35.    Every paycheck Chames has received and receives is an adverse action. (Doc. 55-1, at 154:12-20).

36.    Lynde Meeder has always made money more than Chames (Doc. 62-4, p. 1 & 2).

37.    Judson Blewster has always made more money than Chames (Doc. 62-4, p. 1 & 2).

38.    Josh Doggrell has always made more money than Chames (Doc. 62-4, p. 1 & 3).

39.    William Carl Moses has always made more money than Chames (Doc. 62-4, p. 1 & 4).

40.    Joey Stone has always made more than Chames (Doc. 62-4, p. 1 & 5).

17

41.    Falon Hurst has always made more money than Chames (Doc. 62-4, p. 1 & 6).

42.    Ronnie Murray has always made more money than Chames (Doc. 62-4, p. 1 & 7).

43.    Jordan Luker/Shekels has always made more money than Chames (Doc. 62-4, p. 1 & 8).

## IV.    <u>ARGUMENT</u>

Much like Dorothy always possessed the power to go home whenever she wanted to in Oz, Sheriff Wade had the power to make a civil service employee a non-civil service employee whenever he wanted to just by supplementing their income. However unlike Dorothy, Sheriff Wade in one hand, waved and pointed towards the Commission and the Civil Service pay scale and in the other hand held $5,000 behind his back. The remaining can be seen as a journey down the yellow brick road.

Under Alabama law, a County Commission acts as a "paymaster" of a Sheriff. The County Commission must provide the Sheriff with a reasonable amount of funds to prevent the Sheriff's office from shutting down.[1] This is where the inquiry into the triangular relationship between the Calhoun County

---

[1] *Spears v. Choctaw County Commission*, CV-No. 070275-CG-M, at *15 (S.D. Ala. July 30, 2009)(citing *Etowah County Comm. v. Hayes*, 569 So. 2d 397, 398 (Ala. 1990).

Commission, Sheriff Wade, and Lt. Chames should end. But Wade convolutes the record by highlighting differences between a civil and non-civil service employee. Despite those differences, the Commission could not hire, fire, or modify [Chames] employment. Although the Commission, in tandem with the civil service board, determined Chames' pay rates or methods of wage payment, Wade was the ultimate authority over modifying the terms and conditions of her employment.[2]

In this case, genuine disputes of material fact exist as to circumstances surrounding a $5,000 raise offered to Chames. This raise offer was not enough to remedy pay discrimination Chames was attempting to resolve with Wade. As Chames employer —Wade—not the Commission was the sole authority to modify her pay disparity. Because Wade continues to pay Chames a considerable amount less than her white and male colleagues, his summary judgment motion should be denied.

A.    Disputed Facts Exist as to Chames Title VII, §1981, and § 1983 Claims

Wade argues that Chames claims under Title VII, §1981, and § 1983 claims fail as a matter of law. And the reason they fail is because she cannot show that a similarly situated non-African-American or male comparator received better treatment as a lieutenant. Next, Wade argues that Chames cannot present a proper

---

[2] *Id.* at *15-17.

comparator traveling under the *McDonnell Douglas* or convincing mosaic analytical frameworks. These contentions are not true for the following reasons.

First, establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.[3] Thus, Chames will piece together the evidentiary tiles from the Rule 56 record to show that there has been enough circumstantial evidence for her to defeat summary judgment.  The type of evidence that may support this inference includes, "suspicious timing, ambiguous statements…, and other bits and pieces from which an inference of discriminatory intent might be drawn." [4]

          i.     Wade versus the Calhoun County Civil Service System

The Eleventh Circuit recognizes that the Alabama Code grants the sheriff control over the employees of the jail: authority that is "totally independent of the county commission.[5] By statute, the sheriff appoints, directs, and controls the deputies and jailers who work at the jail and the County has no authority to manage the sheriff's employees.[6]

---

[3] *Lewis v. City of Union City, Georgia,* 918 F. 3d 1213, 1217 (11th Cir. 2019).
[4] *Lewis Id.*
[5] *Chames v. Calhoun Cnty. Comm'n* No. 21-11651  at 5 (11th Cir. Apr. 26, 2022)(citing *Turquitt v. Jefferson Cty.,* 137 F. 3d 1285, 1289.
[6] *Id*. Citing *Lockridge v. Etowah Cty. Comm'n*, 460 So. 2d 1361, 1363 (Ala. Civ. App. 1984).

Wade claims that he should win at summary judgment because Chames pay was ultimately subject to the Calhoun County Civil Service pay scale and he was really not able to do anything about raising her pay. This overarching theme from Wade has some level of attraction to it, "Wade was left in a precarious situation because he controls every aspect of his employees, but Chames was a civil servant and ultimately subject to the civil service pay scale." However, case law and statements from the Rule 56 record penetrate this glossy veneer.

The Eleventh Circuit has held Plaintiff [Chames] has alleged no facts from which we can infer reasonably that Plaintiff can overcome the presumption that the Sheriff's Office and the County are separate and distinct entities. That the County paid Plaintiff's wages and had authority to approve the amount of Plaintiff's pay is insufficient to demonstrate that the County controlled "the fundamental and essential aspects of the employment relationship when taken as a whole."[7] Wade argues that "any pay differential is attributable to the bona fide seniority classification system reflected in the applicable pay scales and implemented by the Board and Commission."[8] However, settled law has determined that in this case the

---

[7] *Chames v. Calhoun Cnty. Comm'n* No. 21-11651 at 6 (11th Cir. Apr. 26, 2022).
[8] Doc. 57 at 35. Note that the page number reflects cmecf filing pagination and not the page number at the bottom of the page.

County simply acted only as "paymaster" and had no control over the essential terms and conditions of plaintiff's employment as a whole.[9]

This can be seen in the record when Sheriff Wade makes statements such as, "I can't enter into contracts that obligate the county to pay money."[10] Or when he discusses the Commission "holding the checkbook" for the Sheriff's 65% Federal Inmate Fund, and if Wade wanted to use the funds he had to request if from the Commission.[11] Wade has the ability to supplement non-civil service position salaries with funds he maintains separately from the Commission or Civil Service Board.[12] In fact, Wade supplements the pay for every white male with a rank of Lieutenant or higher. Further, neither the Civil Service Board nor the Commission have the authority to dictate to Wade how he spends funds.[13]

  ii. Wade's discriminatory pay offer

The evidentiary tiles can now be submitted to weave together a convincing mosaic of circumstantial evidence that Wade was giving Chames the proverbial run around about not being able to control her pay. Chames spoke to Wade in 2018 to complain about her disparity in pay with the other lieutenants and said she thought it was illegal.[14] Wade told Chames to go speak with the County Commission,

---

[9] *Chames v. Calhoun Cnty. Comm'n* No. 21-11651 at 7 (11th Cir. Apr. 26, 2022).
[10] Doc 55-2, at 177:1-5.
[11] Doc. 55-2, at 116:3-14.
[12] Doc. 55-3, at 29:15-30:11.
[13] Doc. 55-3, at 31:8-11.
[14] Doc. 55-1, at 114:3-9.

namely Chairman, Fred Wilson ("Wilson") and Administrator, Mark Tyner ("Tyner") about her complaint of pay disparity.[15] In 2019, after not receiving any answers from the Commission, Chames met with Chief Deputy John Garlick ("Garlick").[16] Garlick told Chames that Wade *convinced* the Commission to give her a $5,000.00 raise but Chames would need to sign away civil service status and waive her right to future raises.[17] The chief deputy's phrasing of "convinced the Commission" implies that Wade was helpless as to controlling whether or not to offer Chames more pay. Chames did not sign the letter accepting the raise. Chames could not accept the fact that she would be stuck at making $42,000.00 a year for the rest of her tenure with the Sherriff and would not be able to earn future raises.[18] Additionally, Wade admits that he offered her a $5,000.00 raise, but denies he told her she would not receive any future raises.[19] There is even a dispute about the existence of this letter as it has not been seen as part of the evidentiary record in this case.[20] Wade denies any personal involvement with the $5,000 pay raise to Chames.[21] To further distance himself from the situation he says, he believes Mark Tyner told him about the Commission allowing him to offer Chames the $5,000

---

[15] Doc. 55-1, at 114:10-115:6.
[16] Doc. 55-1, at 117:12-118:18.
[17] Doc. 55-1, at 117:12-118:1.
[18] Doc. 55-1, at 129:18-21; 157:11-22.
[19] Doc. 55-2, at 157:3-157:11 & 123:15-17.
[20] Doc. 55-2, at 125:18-126:7.
[21] Doc. 55-2, at 123:6-124:10.

and if she took it she would lose civil service status.[22] Again, he is making it seem that the Commission controls who he offers raises to and that he has no ability to set the terms and conditions of employment for Chames. He does not remember ever speaking with Chames directly as her employer about the $5,000 raise.[23]

Indeed, the issue for Chames was not relinquishing civil service it was the issue of foregoing any future raises. Chames would have been fine accepting the raise and waiving status as a civil servant if she could have received more raises. Wade states that he did not know of Chames position of waiving civil service if she could receive more raises "until just recently today or this week." [24]

An employer who intentionally treats a person worse because of sex—for actions or attributes it would tolerate in an individual of another sex— discriminates against that person in violation of Title VII.[25] Additionally, under 42 U.S.C. §1981 an employee can show that but for or because of their race she was treated differently. Chames was offered a raise of $5,000 with the condition that she could not receive future raises. Chames is currently the only-African-American lieutenant employed by the Sheriff. Limiting Chames to $42,000 per year for the rest of her career is the biggest "other bit and piece" of evidence from which an

---

[22] Doc. 55-2, at 156:20-157:11.
[23] Doc. 55-2, at 157:9-13.
[24] Doc. 55-2, at 160:3-16.
[25] *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020)(citations omitted).

inference of discriminatory intent might be drawn." Furthermore when this offer happened in early 2019, Lt. Chames' subordinate, Corrections Sgt. Skekels (white), made more than Chames as a sergeant in 2019-2019. In 2018, Sgt. Shekels made $43,943.28 while her boss, Lt. Chames, made $37,832.06. In 2019, Sgt. Shekels made $48,448.15 while her boss, Lt. Chames, made $41,354.41.

By accepting the raise Chames would forego civil service status. But, white employees, who waive civil service status, such as Meeder, Stone, and Hurst, were able to receive supplemental wage increases from Wade (¶68). A reasonable jury could infer that because white and male employees received future raises and Chames was denied that opportunity, that Wade intended to leave Chames worse off than other employees. Therefore, because of her sex and race Wade treated her differently.

Additionally, each time that Chames receives a paycheck that is insufficient, she suffers from an adverse action. Based on the premise in *Muldrow* (outlined below on p. 27) regarding adverse actions, a reasonable jury could infer that all Chames has to show is that each paycheck leaves her in a financial disadvantage, to meet the adverse action threshold. Thus, summary judgment must be denied.

### B.    Disputed Facts Exist as to Chames' §1981 Retaliation Claim

Wade argues that Chames §1981 retaliation claims fail because she did not engage in a statutorily protected activity and did not suffer an adverse employment

action. Wade's three contentions are: 1) Wade did not and could not unilaterally offer Chames a $5,000 pay raise but instead the Commission offered the raise; 2) The raise cannot meet the legal definition of an adverse action; and 3) Chames cannot show a causal link between the raise and any protected activity.

These contentions ignore parts of the evidentiary record and established case law. To argues these points, Chames will utilize the same convincing mosaic framework to prove her retaliation claims.[26]

First, Wade argues that since the Commission offered the raise not himself, he cannot be held liable for retaliation. Especially, since Chames took an issue with the amount of the raise and not the raise itself. Second, Wade contends that a raise cannot be an adverse action.

Title VII's language makes it illegal for an employer "to fail or refuse to hire discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[27] These "terms", "conditions," or "privileges of employment," are commonly referred to as adverse actions. Adverse actions can take place in the form of hiring, termination, demotion, transfer, etc.

---

[26] *Berry v. Crestwood Healthcare, L.P.*, No. 22-11129, at *14-15 (11th Cir. Oct. 27, 2023).
[27] 42 U.S.C. § 2000e-2(a)(1).

Wade contends that the raise offer of $5,000 was not an adverse action because it did not rise to the level of a "materially adverse action."[28] Specifically, a materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[29] The United States Supreme Court recently addressed in *Muldrow v. City of St. Louis*,  the issue of whether an employee challenging a transfer under Title VII must meet a heightened threshold of harm—be it dubbed significant, serious, or something similar.[30] The Court held that what Muldrow did not have to show that the harm she incurred was significant…serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.[31] "Muldrow need show only some injury respecting her employment terms or conditions. The transfer must have left her worse off, but need not have left her significantly so."[32]

This relates to Chames case when applying the terms of the $5,000 raise as an adverse action. The adverse action was the condition attached to the raise – that Chames would not have the ability to receive future raises. Meaning her pay would remain at $42,000 until she retired from the Sheriff's office. This would have left

---

[28] Doc. 57, at 37.
[29] Doc. 57, at 37 citing *Smith v. City of Ft. Pierce, Fla*., 564 F. App'x 774, 777-78 (11th Cir. 2014).
[30] 144 S. Ct. 967, 974 (2024).
[31] *Id*. at *330.
[32] *Id* at 977

her worse off than remaining a civil servant and receiving wage increases through the Commissions pay scale.

Additionally, each time that Chames receives a paycheck that is insufficient, she suffers from an adverse action. Based on the premise in *Muldrow* regarding adverse actions, a reasonable jury could infer that all Chames has to show is that each paycheck leaves her in a financial disadvantage, to meet the adverse action threshold.

Third Wade claims that Chames cannot show a causal connection between the raise and any protected activity. Specifically, Wade asserts that she never complained to him about pay disparity based on sex and gender, Chames just stated she "felt her pay wasn't fair and felt it was illegal what's being done."[33]

A liberal interpretation of this statement, "illegal what's being done," would mean that Chames is complaining to Wade about illegal pay discrimination based on race and sex. This can be based on the fact that prior to Wade, Chames complained to the Captain (her superior) of the jail about a $20,000 pay disparity being based on her race and gender.[34] Then when the Captain could not help her she went to complain to Wade about her pay being illegal.[35] During that conversation, Wade told Chames that the Commission had not been paying

---

[33] Doc. 57 at 38.
[34] Doc. 55-1, at 109:18-110:23.
[35] Doc. 55-1, at 109:18-110:23; 114:10-20.

employees correctly and that Chames should complain to the Commission.[36] When Chames spoke with the Commission, she was told by Wilson that if she filed an EEOC charge of discrimination it could possibly create a hostile work environment for her at the Sheriff's Department.[37] Additionally, Wilson stated to Chames that he was the only black person at the Commission, and that he did not want to rock the boat too much by helping Chames with her pay disparity.[38] These statements could indicate that Chames complaints about pay disparity create a financial disadvantage for her. This would allow a reasonable jury to conclude that Chames was offered a $5,000 raise with the condition of no future raises, leaving her at an economic disadvantage, is linked causally to her complaints of discrimination to Sheriff Wade. Thus, summary judgment must be denied.

### C.    Disputed Facts Exist as to Chames' EPA Claims

Wade argues that Chames claims under the Equal Protection Act cannot survive summary judgment and should not be heard before a jury. Wade's contentions have 4 prongs: (1) Chames cannot show her skills and qualifications needed to perform jobs of a patrol or investigations lieutenant; (2) other lieutenants performed additional duties in different jurisdictions; (3) "factors other than sex"

---

[36] Doc. 55-1, at 114:10-115:2.
[37] Doc. 55-1, at 156:17-157:3.
[38] Doc. 55-1, at 155:19-157:10.

account for pay disparity and (4) the civil service board sets the pay scale for lieutenants.

These contentions are misplaced. When Wade became Sheriff in 2016, he set the Chief Deputy's pay at $75,000 per year, patrol captain at $65,000, per year and then the deputy lieutenants are set at $55,000 per year.[39] Lieutenants Ronnie Murray and Falon Hurst's pay was set by Wade at $55,000 per year.[40] Wade claims that he can longer control pay rates for employees because he lost the 65 percent Sheriff's inmate fund.[41] According to Wade it was lost as of early 2017.[42] This is up for debate because the Commission is not able to see which specific funds Wade pays his employees.[43] This inability to set pay after 2017 can be placed into doubt by the fact that when Joey Stone was promoted to lieutenant in 2019, Wade adjusted his salary to $65,000.[44] In fact, almost all of Wade's Lieutenants and Captains have increased their salary through Wade since 2017. Thus, contradicting what Wade says earlier about setting lieutenants pay to $55,000 in 2016 and not being able to adjust it after losing the Sheriff's 65% Law Enforcement Account in 2017.

In the EPA affirmative-defense context, the question a court must answer is

---

[39] Doc. 55-2, at 140:2-14.
[40] *Id.*
[41] Doc. 55-2, at 196:16-22)
[42] Doc. 57, ¶69.
[43] Doc. 55-3, at 67:15-68:8.
[44] Doc. 55-2, at 195:23-196:7.

whether the defendant has shown that the evidence is undisputed and that no reasonable juror could find that sex was a factor in the pay decision...A plaintiff is not called upon under the EPA to prove pretext, once the employer meets its heavy burden of establishing its affirmative defense, a plaintiff may defeat summary judgment by pointing to a genuine dispute of a material fact in the Rule 56 record.[45] The record in this case shows, that according to pay documents, Judson Blewster, Josh Doggrell, William Moses, Joey Stone, Falon Hurst, and Ronnie Murray, all males, received substantially more pay than Chames.[46]

Wade will likely reiterate in his reply, the simple reason for pay differences is APOST certification and differences in years on the civil service pay scale create the discrepancy in pay. But the record contains evidence that Wade had the ability to set pay wages for male employees while allowing them to receive future raises while the same prospect was not offered to Chames. Thus, summary judgment must be denied.

D.     Chames' Lilly Ledbetter Fair Pay Act Claims

Under the Lilly Ledbetter Fair Pay Act of 2009 an unlawful employment practice occurs, with respect to discrimination in compensation...when a discriminatory compensation decision or other practice is adopted, when an

---

[45] *Baker v. Upson Reg'l Med. Ctr.,* 94 F. 4th 1312, 1320 (11th Cir. 2024).
[46] See Doc. 55-2, Plaintiff's Exhibit 2, Pay Stub Comparisons.

individual becomes subject to a discriminatory compensation decision or other practice or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages…is paid, resulting in whole or in part from such a decision or other practice.[47] This act clarifies that a discriminatory compensation decision or other practice that is unlawful under such Act occurs each time compensation is paid pursuant to the discriminatory compensation.[48] It has been held that a plaintiff was the subject of a discriminatory compensation decision or other practice when his employer forced him to take sick leave after complaining of discrimination. [49] Further, The Ledbetter Act simply renews a plaintiff's cause of action each time the plaintiff receives a discriminatory paycheck.[50]

Each paycheck he received was a discrete, actionable act and he "allege[d] a persistent discriminatory salary structure" rather than "isolated discriminatory acts that had continuing consequences under neutral salary systems"[51] In this case, Chames was subjected to a discriminatory compensation practice when she was offered a raise that was punitive in nature by not allowing her to receive future raises. The record shows she complained about discriminatory pay practices in late

---

[47] 42 U.S.C. 2000e-5(e)(3)(A).
[48] *Id.*
[49] *Coppett v. Tenn. Valley Auth*. Civil Action No. CV-11-S-4227-NE at 20 (N.D. Ala. Sep. 11, 2012).
[50] *Johnson v. Austal*, U.S.A., L.L.C., 805 F. Supp. 2d 1299 (S.D. Ala. 2011))
[51] *Id.*

2018 and in 2019 was offered the discriminatory raise. Chames damages for pay should not be limited to the 2018-2019 time frame, but each pay check before and since then has been a discrete actionable act that entitles her to recover damages. Therefore, Chames has been a part of a discriminatory pay structure since she became a lieutenant in April 2016 to present. Thus, Chames can recover damages for each discriminatory pay check she has received. Wade continues to hide under the guise of civil service, when Chames was hired full time in April 2016 she was not a civil service employee. A reasonable jury could infer that when she was placed in a civil service position (or anytime in between) under Wade she was subjected to a discriminatory pay structure. Thus, summary judgment must be denied.

## V.    <u>CONCLUSION</u>

Based on the foregoing, genuine disputes of material fact exist as to Chames pay based on her race and sex. Summary judgment should be denied and this case should proceed to a jury trial.

Respectfully submitted,

*/s/ Blake C. Edwards*
*/s/ Nicole D. Edwards*
*Attorneys for Plaintiff*

**OF COUNSEL:**
**EDWARDS & EDWARDS**
**ATTORNEYS AND MEDIATORS, PLLC**
3603 Pine Lane SE, Suite C
Bessemer, Alabama 35022
Tel: (205) 549-1379
Fax:(205) 719-4033
E-mail: nicole@edwardsattys.com
        blake@edwardsattys.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2025, I officially sent the foregoing via electronic mail to the following:

W. Jackson Britton, Esq.
Capell & Howard, P.C.
150 South Perry Street
Montgomery, AL 36104
jackson.britton@chlaw.net

/s/ Nicole D. Edwards
OF COUNSEL