## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**LATONYA CHAMES,**
     Plaintiff,

**v.**　　　　　　　　　　　　　　**Case No. 1:21-cv-1571-CLM**

**SHERIFF MATTHEW WADE,**
     Defendant.

## MEMORANDUM OPINION

LaTonya Chames, a black woman, was a Corrections Lieutenant for former Calhoun County Sheriff Matthew Wade, a white male. Chames sues Wade for (a) paying her less money because of her race and gender, then (b) retaliating against her for pointing out the pay disparity. Wade moves for summary judgment. (Doc. 54). For the reasons stated below, the court **GRANTS** Wade's motion for summary judgment on all counts.

## BACKGROUND

Wade's motion boils down to two questions. First, do the parties genuinely dispute the explanation for this pay disparity in 2018:

|  | Race & Gender | Position | Annual Pay (approx.) | Civil Service |
|---|---|---|---|---|
| Fallon Hurst | White male | Investigations Lieutenant | $55,000 | No |
| Ronnie Murray | White male | Patrol Lieutenant | $55,000 | No |
| Latonya Chames | Black female | Corrections Lieutenant | $37,832 | Yes |

Second, after Chames complained to her supervisor about the disparity, did Wade take an "adverse action" against Chames by offering her a $5,000 raise instead of the $17,000 needed to close the pay gap?

1

On the first question, Sheriff Wade says the pay gap existed for two main reasons: (1) patrol and investigation officers perform different roles that require different credentials and present unique dangers not faced by corrections officers and (2) Chames was paid within Calhoun County's civil service system, which dictates a particular seniority-based pay scale, while Hurst and Murray were exempt from the civil service system because they were paid in part with funds outside the civil service system. As for the second question, Wade says that, after Chames complained about the gap, Chames was offered a $5,000 raise from funds outside the civil service system—with the caveat that accepting those funds would necessarily remove Chames from the civil service system. Chames turned down the raise because she deemed it insufficient. Because Chames decided to maintain the status quo, Wade says that he did not take an "adverse action" that supports a retaliation claim.

Below, the court details the facts, which fall into three categories: undisputed facts; facts that Chames disputes without a genuine basis; genuinely disputed facts. When needed, the court explains the difference and presents the genuinely disputed facts in the light most favorable to Chames because she is the non-moving party.

## A. Calhoun County Civil Service System

The Alabama Legislature created the Calhoun County Civil Service System to govern the "selection and employment of all individuals in the service of Calhoun County, Alabama, except for those exempted in Section 45-8-120.01[.]" Ala Code § 45-8-120. This provision covers persons who work for the "sheriff". *Id.* Based on an individual's 'exempt' status under § 45-8-120.01, persons who work for the sheriff fall into two categories: civil service employees and non-civil service employees.

1. *Civil service employees*: All employees "covered by this article shall be selected and hold their positions pursuant to this article and the board's implementing rules and regulations." *Id.* The article goes on to cover issues like employment applications (§ 120.09), performance ratings (§ 120.10), employee discipline (§ 120.13), and employer discrimination (§ 120.19). The Board's implementing rules and regulations fill in the gaps.

*See* (Doc. 56-1, 56-2, 56-3). Relevant here, the implementing rules govern starting pay (§ 4.7.4), pay for overtime work (§ 9.2.2), pay levels (§ 10.4.1), pay increases (§§ 10.7.1, 10.7.2), pay upon job reassignment (§ 10.8), and pay after a break in service (§ 10.5.2). The Board's implementing rules dictate strict adherence to the pay scale: "Deviations from the approved compensation plan and the guidelines contained herein will not be authorized." (Doc. 56-3, p. 23, § 10.1.2).

2. *Non-civil service employees*: To deviate from the pay scale, county employees must be removed from the civil service system by making them "exempt" under Ala. Code § 45-8-120.02. Relevant here, an employee can be exempted from civil service status if he "is not paid ***exclusively*** by Calhoun County." Ala. Code § 45-8-120.02(i) (emphasis added). So, for example, if an employee was paid $30,000 by the county, plus $10,000 from a separate fund, that employee is "exempt" from the civil service rules and regulations because his pay is not exclusively from the county. Once exempted from the civil service pay scale, the employee is also exempt from the protections and benefits offered by the Board's statute and implementing rules—including the longevity/step increases (§ 10.7.1) and across-the-board pay increases (§ 10.7.2) provided by funds approved the County Commission (§ 10.7).

3. *Circuit interpretation*: The Eleventh Circuit read this statute in an unpublished opinion stemming from Chames' lawsuit against the County Commission. In that decision, the Eleventh Circuit held that even though Chames was paid by the county, and the county had to approve or disapprove of Chames' salary, Sheriff Wade alone was her employer. *See Chames v. Calhoun Co. Comm.*, 2022 WL 1217652, *3 (11th Cir. Apr. 26, 2022). This court reads the Circuit's unpublished decision to say that the County Commission / Civil Service Board was Chames' "paymaster," *id.*, leaving Wade (her boss) with the discretion to recommend a pay raise as long as it fit within the civil service statute and its implementing rules. For example, Wade could recommend Chames be exempted from civil service status so that he could supplement her pay with other funds, if he had access to those funds.

**B. Calhoun County Sheriff's Office**

Wade was Calhoun County Sheriff from 2016 until 2025. Before and during his tenure, the Sheriff's Office was divided into three departments: patrol, investigations, and corrections. Generally, patrol enforces the laws across the county; investigations investigates potential violations of the law; and corrections controls the county jail and cares for its inmates.

The Sheriff's Department was governed by a chain of command with the Sheriff and Chief Deputy Sheriff at the top. Below the two executives, each division was governed by a chain of command that used these divisional titles from top to bottom: captain, lieutenant, sergeant, corporal, and officer.

**C. Chames' employment**

Chames started working for the Sheriff as a corrections officer, the lowest rank within the corrections department, in 2002. Upon completing her provisional period in July 2002, Chames gained civil service status.

In 2008, Chames became a licensed practical nurse (LPN) for the county jail. Chames was an independent contractor, which is one of the categories exempted from the civil service statute. *See* Ala. Code § 45-8-120.01(f). So Chames was no longer a civil service employee. Chames kept working as an LPN for more than six years, which resulted in Chames losing credit for her years of civil service as a corrections officer under the Board's implementing rules, §§ 10.5.2 and 10.6.4. (Doc. 56-3, pp. 25-26).

Chames returned to the corrections division as a temporary corrections lieutenant in 2015, then returned to civil service status in 2016 when the Sheriff hired her as a full-time corrections lieutenant. As a corrections lieutenant, Chames oversees jail operations, including supervision of corrections sergeants and officers.

**D. Pay disparity and $5,000 raise offer**

In 2018, Chames told the corrections captain (her direct supervisor) that she did not believe that the pay disparity between her (about $37,000) and the patrol and investigation lieutenants Ronnie Murray and Falon Hurst ($55,000 each) was fair. She later voiced the same concern to Sheriff Wade and then Chief Deputy Sheriff Jon Garlick.

The parties agree that in 2019, after Chames met with Wade and others, Chames was (a) offered a $5,000 raise during a meeting with Garlick but (b) because the raise would be paid from other funds, Chames would lose her status as a civil service employee. But the parties dispute if and how the topic of future raises was addressed. Because the court must view the facts in the light most favorable to Chames—the court quotes Chames' testimony about Garlick's meeting and assumes it is true:

> Q. So let's focus on the latter half of that part where they said that they could do something. Can you tell me who told you -- who was they? Who told you they could do something?
>
> A. What I remember distinctly is the chief calling me into the office and having a paper in front of him, and he said something about the sheriff being able to convince the commission to give me a $5,000 raise, but there were a lot of -- there were concessions that I would have to make and -- yeah.
>
> Q. What were those concessions? Do you recall?
>
> A. In the letter it stated something about I would no longer be civil service and that I would -- that $5,000 would be all I would get, and I would have to -- I understood I wouldn't get any more raises.
>
> Q. Was there a time limit to that, let's call it a cap, on your raises, the $5,000? Is that fair to say? So you wouldn't get any more raises after that $5,000? Is that just for that year, or was it for all time? Do you recall?

A.   If I recall correctly, it just said you waive rights to all future raises. That's what I think I remember the letter saying.

Q.   Did they explain -- I'm sorry. Did the chief deputy explain to you why he was giving you this letter?

A.   He said that -- something about the sheriff paying out a discretionary fund or something.

Q.   And at that time you were a civil service employee, correct?

A.   Correct.

Q.   And did he explain that if you were paid not solely from county commission funds, that you would then no longer be considered a civil service employee?

A.   He -- I don't -- he didn't go into detail about it.  He just -- you know, it was on the paper.

Q.   Were you aware at the time that a -- an employee who is paid not solely from county commission funds would no longer be a civil service employee?

A.   No.  Not at the time -- I mean, just when they presented, I guess, the paper to me.

Q.   Have you learned that information since then, or is this the first you're hearing about it?

A.   At the time, I think there may have been some talk about it.

Q.   What was your response to the letter?

A.   I said to him, I said, Chief, I think at the time I was making 37 or -- and the way that I calculated it, it was only -- I was going to make -- I was going -- that would bring my pay to 42,000. I said that is still a substantial gap and then you're telling me that you're -- I will never get any more raises. I said -- but there's still a

> substantial gap in between what I and this individual, the other males, the other people, were making. I said that's not fair. It's not -- and that's what I said to him.

(Doc. 55-1, p. 32). Neither party produced the letter Chames mentioned, so the court must assume that Garlick presented the offer as Chames describes. That said, the court notes that Chames didn't mention a waiver of future raises when she described her meeting with Garlic to the EEOC. Rather, consistent with Wade's account, Chames told the EEOC that the acceptance letter merely said that Chames had to "waive [her] rights as a civil service employee," which necessarily results in the lost pay increases under Sections 10.7.1 and 10.7.2 of the Board's rules:

> On June 28, 2019, Chief Deputy Jon Garlic notified me that the Commission decided to offer me a $5,000.00 salary increase. Chief Deputy Garlic also told me that Sheriff Wade tried to persuade the Commission to offer me a raise that would bring my salary in line with the white male lieutenants, but the Commission refused. Chief Deputy Garlic presented me with an acknowledgment to sign in exchange for the $5,000.00 per year raise. The acknowledgment stated that Sheriff Wade was financially responsible for my raise and that I agreed to waive my rights as a civil service employee. I refused to sign the acknowledgment and reported that the document was presented to me in retaliation for reporting race and gender discrimination. To my knowledge, no other lieutenant has been asked to sign such an acknowledgement.

(Doc. 28-3). The parties agree that Chames "turned down the offer because, according to her calculations, she would be making $42,000.00 a year and it did not address the pay gap between her and the other lieutenants." (Doc. 57, p. 24) (undisputed fact #108).

### E.   Litigation

1. *EEOC charge*: Chames filed her first EEOC charge in November 2019, alleging that the County Commission (a) discriminated against her based on the pay gap with Hurst and Murray and (b) retaliated against her by offering a raise that did not completely close the gap. (Doc. 28-1). Chames later amended the charge to add the Sheriff's Department as an additional employer. (Doc. 28-3). The EEOC issued Chames a right to sue letter for the Sheriff's Department on July 22, 2021. (Doc. 1-2).

2. *Litigation*: Chames sued the County Commission and the Sheriff's Department separately. As mentioned, the Eleventh Circuit affirmed this court's (Judge Axon) dismissal of Chames' case against the County Commission because the Sheriff, not the Commission, employed Chames. *See Chames*, 2022 WL 1217652.

In this case, the court granted the Sheriff's Department's motion to dismiss and allowed Chames to substitute Wade as the defendant. (Doc. 24). After ruling on Wade's Rule 12 motion to dismiss (doc. 35), these claims remain: "Chames' § 1981 claims for race discrimination and retaliation, Title VII claims for race and gender discrimination, Equal Pay Act and Lilly Ledbetter Fair Pay Act claims, and Equal Protection claims for race and gender discrimination[.]" (Doc. 35, p. 14). Wade now seeks summary judgment on these claims. (Doc. 54).

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Chames' amended complaint pleads nine counts (doc. 9) and has been the subject of two opinions. In the first, the court dismissed all claims pleaded against the Sheriff's Department, which included Counts 4-6 in whole, and Counts 1-3 in part because those counts also named Sheriff Wade. (Doc. 24). But the court said it would allow Chames to substitute Wade for the Sheriff's Department. In the second opinion, the court dismissed Count III (Title VII retaliation) because Chames failed to timely file a charge with the EEOC. (Doc. 35, pp. 8, 14). The court also dismissed any claims based on vicarious liability; any official capacity claims; and any claims for punitive damages. (*Id.*, p. 14).

As a result, the following claims against Wade in his individual capacity are before the court:

- o **Count 1:** Race discrimination under §§ 1981, 1983
- o **Count 2:** Retaliation under § 1981, 1983
- o **Count 4:** Race discrimination under Title VII
- o **Count 5:** Gender discrimination under Title VII
- o **Count 6:** Unequal pay under Equal Pay Act and the Lily Ledbetter Fair Pay Act
- o **Count 7:** Gender discrimination under § 1983
- o **Count 8:** Race discrimination under §§ 1981, 1983
- o **Count 9:** Unequal pay under Equal Pay Act and the Lily Ledbetter Fair Pay Act.

As you can see, some of these claims are duplicative (*e.g.*, Counts 6 and 9) and some plead the same theory under similar statutes (*e.g.*, Counts 1, 4, and 8). The court thus groups certain claims where appropriate, starting with the race discrimination claims.

### <u>Counts 1, 4, 8</u>: **Race Discrimination, § 1981 and Title VII**

Chames claims that Wade violated § 1981 and Title VII by refusing to pay her as much as Murray and Hurst because she was black. Before the court addresses the merits of Chames' claim, however, it must address the proper standard.

1. *Proper Standard*: The parties brief this issue in part by using the *McDonnell Douglas* burden-shifting framework. But the Eleventh Circuit has signaled a departure from *McDonnell Douglas* toward a more basic, Rule 56-based inquiry: Has the Plaintiff submitted enough evidence to allow a reasonable juror to find that the Defendant employer acted against Plaintiff because of her race? *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) ("The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee"); *Tynes v. Fla. Dep't of Juv. Justice*, 88 F. 4th 939, 946-47 (11th

Cir. Dec. 12, 2023) ("This rearticulation of the summary judgment standard arose in large part because of widespread misunderstandings about the limits of *McDonnell Douglas*—the same misunderstandings that persist today. A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit."). In a recent Title VII case, Justice Thomas likewise criticized *McDonnell Douglas's* use in judging Rule 56 motions and said that "litigants and lower courts are free to proceed without the *McDonnell Douglas* framework." *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1555 (2025).

This court will follow the Circuit and Justice Thomas's lead by judging Wade's motion only under Rule 56.

2. *Sheriff Wade's Evidence of Non-Discrimination*: Rule 56(a) starts with the moving party's burden to show that there is no genuine dispute about a material fact. Both of Chames' claims (Section 1981 and Title VII) require that she prove as a matter of fact that Wade paid her less money than Murray and Hurst because she is black. *See* 42 U.S.C. § 1981; § 2000e-2(a)(1).

Wade says that race played no part in the difference between Chames' pay and Murray and Hurst's pay. Rather, Wade says, it cannot be *genuinely* disputed that he paid Chames differently than Murray and Hurst because (a) Chames was subject to the civil service employee pay scale, while Murray and Hurst were not, and (b) corrections officers like Chames perform different functions, have different responsibilities, and require different credentials than investigators and patrol/enforcement officers. (Doc. 57, pp. 34-35).

The court finds that Wade presents enough evidence to support both rationales. First, Wade rightly notes that Alabama law and the Board's implementing rules and regulations treat differently the salaries of persons within the civil service system and those exempted from it. And with regard to civil service employees, the rule is clear: "[d]eviations from

the approved compensation plan and the guidelines contained herein will not be authorized." (Doc. 56-3, p. 23, § 10.1.2). Because Chames was a civil service employee, Wade could not deviate from the requisite pay scale without removing Chames from the civil service system—as demonstrated by letters for other employees who received pay increases via other funds that told the employees that they would lose civil service status:

Lynde Green
Calhoun County Sheriff Department

Lynde Green,

On January 11, 2016, Sheriff Larry Amerson sent a letter (enclosed) to the Calhoun County Commission requesting a pay increase, for you, from a Sergeant to a Lieutenant. The Sheriff requested this increase to be funded by the Sheriff's 65% Federal Inmate Fund.

The Calhoun County Civil Service Board stated in a letter (enclosed) dated February 9, 2016, "If this employee's salary is to be supplemented by the Sheriff's 65% fund, she would not be paid solely by Calhoun County and not covered under the Civil Service System".

After reviewing the enclosed letters please sign below as indicated and return to the Payroll Department.

Brian Conary
Human Resources Manager
Calhoun County Commission

_____  I understand and acknowledge the enclosed letters.

_____  I understand and DO NOT acknowledge the enclosed letters.

(Doc. 56-62) (Lynde Green Meeder).

Dear Sgt. Stone:

On Dec. 26, 2016 you will be promoted from Sergeant to Lieutenant. The increase in pay will be funded by the Sheriff's 65% Federal Inmate Fund.

Under the Civil Service Rules any individual who is not paid exclusively by Calhoun County is to be exempted and not covered under the Civil Service System.

By signing this letter you understand and acknowledge that you will not be covered under the Civil Service.

Sgt. Joseph Stone

Date: 12-13-16

Matthew Wade, Sheriff

(Doc. 56-54, p. 4) (Joseph Stone).

William Carl Moses

400 W 8th Street

Anniston, AL 36201

On October 28, 2019, you have been hired as a Deputy Sergeant. Your pay will be increased to $50,000 per year. This pay increase will be funded by the Calhoun County Mental Health Board.

Under the Civil Service Rules any individual who is not paid exclusively by Calhoun County General Fund is to be exempted and not covered under the Civil Service System.

By signing this letter you understand and acknowledge that you will not be covered under the Civil Service System.

William Carl Moses

Date: October 28, 2019

(Doc. 56-31, p.2) (Williams Carl Moses).

12

Second, while the title "lieutenant" is the same, the job of a patrol and investigation lieutenant is different from the job of a corrections lieutenant. For example, corrections officers like Chames work at the county jail, while patrol deputies work all over Calhoun County. Further, patrol and investigation officers have arrest powers that require "APOST" certification—*i.e.*, a 16-week training course followed by continuing education. Both Murray and Hurst were APOST certified. Chames neither needed nor had APOST certification because, as a corrections officer, she dealt with already-detained individuals. In *McDonnell Douglas* terms, Chames was not similarly-situated to either male lieutenant.

In sum, Wade presents evidence that would allow a reasonable juror to find either or both that (a) Wade had to pay Chames differently than Murray and Hurst because of civil service statutes and rules and/or (b) Wade paid Murray and Hurst differently than Chames because they performed different jobs, that required more qualifications, than Chames. Thus, to avoid summary judgment, Chames must offer enough evidence to allow the same reasonable juror to instead find that Wade paid Chames differently because she was black. *See* Fed. R. Civ. P. 56(c); 56(e).

3. *Chames' Evidence of Discrimination*: Chames has no direct evidence of race discrimination. Wade never said that race played a factor in his hiring and salary decisions, and Chames offers no evidence that Wade ever made disparaging remarks about a black employee.

As indirect evidence that race mattered to Wade's payment of the differing group lieutenants, Chames points to these facts:

- Wade could have given Chames a raise with funds Wade held outside the civil service system;
- Wade offered to give Chames a $5,000 raise instead of the $17,000 needed to close the gap with Murray and Hurst;
- Wade conditioned the $5,000 raise on Chames giving up future raises; and,
- Wade paid her white counterpart, Jordan Luker Shekels, more money than he paid Chames.

(Doc. 63, pp. 20-27). As discussed below, none of these facts—even if Chames proved them true—could allow a reasonable juror to find that **race** mattered to Chames' salary. The court starts with Shekels' pay.

a. *Jordan Luker Shekels*: Shekels is a white female. Wade promoted her from to Corrections Sergeant to Corrections Lieutenant—the same position Chames held—in December 2019. (Doc. 62-7). As Chames puts it:

> Since her appointment to Lt. on December 16, 2019. Shekels has always been paid more than Chames: In 2020 Shekels made $52,670.01 and Chames made $41,345.41; In 2021 Shekels made $51,426.83 and Chames made $45,946.44; In 2022 Shekels made $54,835.93 and Chames made $47,428.88; In 2023 Shekels made $58,838.91 and Chames made $50,417.50; In 2024 Shekels made $60,640.34 and Chames made $52,875.14. (Doc. 62-4, at p. 1 & 8).

(Doc. 63, p.12). But rather than prove race mattered to Chames' salary, Shekels' pay supports Wade's point that he paid corrections officers within the civil service rules and regulations, regardless of race.

Like Chames, Shekels was a non-exempt civil service employee in the corrections group—not an exempt employee in patrol or investigations like Hurst and Murray. When Wade promoted Shekels from sergeant to lieutenant, Wade did ***not*** exempt Shekels from civil service status so that he could pay her $55,000 like his white investigations and patrol lieutenants, Murray and Hurst. Rather, Wade left Shekels in the civil service system and paid her the requisite civil service salary—just like he paid Chames. In other words, Wade treated a similarly situated white employee like he treated Chames: He paid both corrections lieutenants within the civil service system. That Shekels made more money than Chames resulted not from her race, but from extra overtime pay and years in the civil service system. *Compare* docs. 56-17, 56-19 (pay scale); *with* 56-23, 56-40 (Shekels had been employed by Sheriff since 2013); *and* 58-23 (Chames' pay stubs); *and* 58-31 (Shekels' pay stubs).

b. *Ability to seek raises*: Chames next points to Wade's failure to offer her a raise even though Wade had the "ability to supplement non-civil service position salaries with funds he maintains separately from the Commission or Civil Service Board." (Doc. 63, p. 24). Wade does not dispute that he *could* pay a non-exempt civil service employee like Chames more money if (a) Wade had funds from another source to cover the raise; (b) the County Commission approved the change in salary and status; and (c) the employee understood that accepting the raise would remove her from civil service status. Indeed, as shown in the letters pasted above, Wade made that offer to other employees when promoting them to a new position.

But these facts offer no proof that race mattered to Chames' pay—or to the salary of any of the sheriff's other employees. Chames does not dispute that many of the sheriff's employees, including some sergeants and both corrections lieutenants (one white, one black), are paid within the civil service system. *See* (Doc. 57, p. 15) (undisputed facts #73-74). Nor does Chames dispute that Wade hired a black man, Marcus Wood, to be Patrol Captain, and used non-county funds to pay him as a non-exempt employee.

In short, the evidence shows that Wade used his limited non-county funds to pay certain *positions* more money. Whether Wade made the right choice to focus on other positions is irrelevant; neither Title VII nor § 1981 allow this court to judge how Wade chose to spend non-county funds, as long as race didn't matter to that choice. As the Eleventh Circuit put it:

> Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. That is true 'no

> matter how medieval a firm's practices, no matter how high-
> handed its decisional process, no matter how mistaken the
> firm's managers.'

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)
(internal citations omitted).

c. *Lowball offer*: Chames next argues that Wade's post-complaint
offer of a $5,000 annual raise—rather than a $17,000 annual raise that
would close the pay gap between Chames, Murray, and Hurst—is
evidence of race discrimination. While it is undisputed that Chames was
offered a $5,000 raise, this fact does not create a genuine issue about the
reason Chames was paid less than Murray and Hurst for two reasons.[1]

First, Chames presents no evidence that Wade had access to enough
non-county funds to increase her salary by $17,000 per year. If Wade could
not pay Chames $17,000 more per year, then his alleged lowball offer had
nothing to do with Chames' race; it was a matter of economics that applied
equally to all of Wade's employees, regardless of race.

Second, as Wade notes, offering Chames a raise is a positive action,
not the adverse action required to prove discrimination. Unless Chames
has evidence that Wade had $17,000 per year to offer (she doesn't), no
reasonable juror could find that Wade offered to pay Chames $5,000 more
because he wanted to discriminate *against* a black employee.

d. *No future raises*: Finally, Chames argues that Wade forcing her
to waive all future raises to accept the $5,000 annual raise—a condition
Wade did not impose on white non-civil service employees—is evidence
that Chames discriminated based on race. (Doc. 25, p. 27). As explained
below, the court finds that Chames fails to properly support this fact

---

[1] As detailed in subpart (d), Chames told a different story to the EEOC: "Sheriff Wade tried to
persuade the Commission to offer me a raise that would bring my salary in line with the white
male lieutenants, but the Commission refused." (Doc. 28-3, p. 3). That means the EEOC
investigated Chames' case with Wade as hero, not villain. But Wade does not argue
administrative exhaustion, so the court considers Chames' present version of the story—*i.e.*,
Wade intentionally lowballed Chames because she was black.

assertion, *see* Fed. R. Civ. P. 56(c)(1), and thus will not consider it as part of Chames' case opposing summary judgment. *See* Fed. R. Civ. P. 56(e) (outlining the options for failing to satisfy Rule 56(c)(1)). In fact, the court finds this sanction relatively minor considering Chames' 180-degree turn on this fact issue.

i. *Unsupported assertion*: When deposed, Wade flatly denied that he told Chames or anyone else that Chames would not get future raises if she left civil service status. To the contrary, Wade testified that he *would* have sought raises for Chames, along with his other exempt employees:

> Q.  Did you offer – did you say that she would never get any more raises?
>
> A.  Absolutely not.
>
> . . .
>
> Q.  Okay.  So you didn't have a personal conversation with
>
> A.  I don't think so.
>
> Q.  You don't believe -- okay.
>
> A.  Yeah.  I don't think so because I think I would remember that, and she would have asked me about the raises.  I would have ensured that that would have been a part of it, you know.  Everybody else that's ever come out of civil service gets raises. And there might have been a time 1 or two where somebody -- where they didn't, and I had to call up there and correct it, but, you know, that was part of the deal.

(Doc. 55-2, pp. 33, 42).

Chames does not allege that Wade told her that he would not seek future raises for her or that the pair even talked about future raises. Instead, to support her fact assertion that Wade imposed a 'no future

raises' condition, Chames cites this portion of her own deposition that describes a meeting she had with Chief Deputy Garlick—not Wade:

> Q. So let's focus on the latter half of that part where they said that they could do something. Can you tell me who told you -- who was they? Who told you they could do something?
>
> A. What I remember distinctly is the chief calling me into the office and having a paper in front of him, and he said something about the sheriff being able to convince the commission to give me a $5,000 raise, but there were a lot of -- there were concessions that I would have to make and -- yeah.
>
> Q. What were those concessions? Do you recall?
>
> A. In the letter it stated something about I would no longer be civil service and that I would -- that $5,000 would be all I would get, and I would have to -- I understood I wouldn't get any more raises.
>
> Q. Was there a time limit to that, let's call it a cap, on your raises, the $5,000? Is that fair to say? So you wouldn't get any more raises after that $5,000? Is that just for that year, or was it for all time? Do you recall?
>
> A. If I recall correctly, it just said you waive rights to all future raises. That's what I think I remember the letter saying.
>
> Q. Did they explain -- I'm sorry. Did the chief deputy explain to you why he was giving you this letter?
>
> A. He said that -- something about the sheriff paying out a discretionary fund or something.
>
> Q. And at that time you were a civil service employee, correct?
>
> A. Correct.

> Q.  And did he explain that if you were paid not solely from county commission funds, that you would then no longer be considered a civil service employee?
>
> A.  He -- I don't -- ==he didn't go into detail about it.  He just -- you know, it was on the paper==.
>
> Q.  Were you aware at the time that a -- an employee who is paid not solely from county commission funds would no longer be a civil service employee?
>
> A.  No.  Not at the time -- I mean, just when they presented, I guess, the paper to me.
>
> Q.  Have you learned that information since then, or is this the first you're hearing about it?
>
> A.  At the time, I think there may have been some talk about it.
>
> Q.  What was your response to the letter?
>
> A.  I said to him, I said, Chief, I think at the time I was making 37 or -- and the way that I calculated it, it was only -- I was going to make -- I was going -- that would bring my pay to 42,000. I said that is still a substantial gap and then you're telling me that you're -- I will never get any more raises. I said -- but there's still a substantial gap in between what I and this individual, the other males, the other people, were making.  I said that's not fair.  It's not -- and that's what I said to him.

(Doc. 55-1, p. 32) (highlight added).[2] As you can see, Chames did not testify that the Chief Deputy told her that Wade conditioned her one-time $5,000 raise on a waiver of all future raises. Instead, as the highlighted parts show, Chames testified that she *thinks* the 'no future raises' condition was written on a paper letter, but she wasn't sure. Neither side has produced that letter. Assuming that letter exists (as the court must),

---

[2] Chames cites this passage as supporting her fact assertion on pages 11 and 23 of her brief in opposition. (Doc. 63).

neither side has produced testimony that would establish who added the 'no future raises' condition to the paper letter. Perhaps it was the Civil Service Board or County Commission, thus breaking any tie with Wade, who denied creating the condition and testified he would not have enforced it. Without *any* evidence that Wade played a role in requiring Chames to waive all future raises if she accepted a $5,000 raise, there can be no assumption that Wade added the condition because of Chames' race.

ii. *Shifting story*: In fact, Chames' assertion that Wade personally decided to lowball Chames with a $5,000 one-time raise in exchange for a written waiver of all future raises conflicts with the narrative she gave the EEOC in 2019 and 2020:

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet)
THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
In early 2019, I met with Sheriff Wade and reported race and gender discrimination. I explained that I was being paid less than the other lieutenants based on my race and gender. Sheriff Wade agreed that my pay was unfair and told me that he would petition the Commission to increase my salary. Around April 2019, Sheriff Wade informed me that he had petitioned the Commission, but the members would not agree to increase my pay. Sheriff Wade told me that he was going to draft a letter to the Commission to formally request that my pay be increased to an amount comparable to the white male lieutenants.

In May 2019, Sheriff Wade informed me that the Commission was considering increasing my salary by $5,000.00 per year. A $5,000.00 salary increase would be insignificant when comparing my pay and the other lieutenants' pay. I informed Sheriff Wade that the proposed salary increase did not correct the large gap in my pay and, again, reported discrimination based on my race and gender.

Around the end of May 2019, I spoke with Commissioner Fred Wilson concerning the issues with my pay. Commissioner Wilson told me that he could not help me and directed me to speak with the County Administrator, Mark Tyner. After reporting my pay inequality to Mark Tyner, he informed me that he would "look into" my claims. To date, Mark Tyner has not followed up with me concerning my claims.

On June 28, 2019, Chief Deputy Jon Garlic notified me that the Commission decided to offer me a $5,000.00 salary increase. Chief Deputy Garlic also told me that Sheriff Wade tried to persuade the Commission to offer me a raise that would bring my salary in line with the white male lieutenants, but the Commission refused. Chief Deputy Garlic presented me with an acknowledgement to sign in exchange for the $5,000.00 per year raise. The acknowledgement stated that Sheriff Wade was financially responsible for my raise and that I agreed to waive my rights as a civil service employee. I refused to sign the acknowledgment and reported that the document was presented to me in retaliation for reporting race and gender discrimination. To my knowledge, no other lieutenant has been asked to sign such an acknowledgement.

(Doc. 28-3, p. 3) (amended charge). As you can see, Chames twice pinned the blame on the County Commission, not Sheriff Wade. Rather than paint Sheriff Wade as the villain, Chames told the EEOC that Sheriff Wade tried but ultimately failed to secure the full $17,000 raise for her. She also told the EEOC that the written waiver was the same general waiver of "rights as a civil service rights" included in the previously pasted letters signed by white non-civil service employees. Chames never

mentioned a 'no future raises' condition, much less Wade creating the condition because of racial animus.

Chames pleaded the same pro-Wade narrative in her November 2020 complaint against the County Commission, and her proposed amended complaint in April 2021 (quoted below):

> 41. Sheriff Wade agreed that Plaintiff's pay was unfair and told her that he would petition the Commission to increase her salary.
>
> 42. Around April 2019, Sheriff Wade informed Plaintiff that he had petitioned the Defendant to increase her pay, but the members would not agree to raise her salary.
>
> 43. Shortly thereafter, Sheriff Wade told Plaintiff that he was going to draft a letter to the Commission to formally request that her pay be increased to an amount comparable to the white male Lieutenants.
>
> 44. In May 2019, Sheriff Wade informed her that the Commission was considering increasing her salary by $5,000.00 per year. . . .
>
> 50. On June 28, 2019, Chief Deputy Jon Garlick (white male) notified Plaintiff that the Commission decided to offer her a $5,000.00 salary increase.
>
> 51. Chief Deputy Garlic also told Plaintiff that Sheriff Wade tried to persuade the Defendant to offer her a raise that would bring her salary in line with the white male Lieutenants, but the Commission refused.
>
> 52. Chief Deputy Jon Garlick presented Plaintiff with an acknowledgement to sign in exchange for the $5,000.00 per year raise.

53. The acknowledgement stated that Sheriff Wade was financially responsible for Plaintiff's raise and that Plaintiff agreed to waive her rights as a civil service employee.

Chief Deputy Garlick also reported that Sheriff Wade had tried to persuade the County to remedy the pay disparity, but that the County had refused. (Doc. 1 at 6).

In exchange for her $5,000 pay increase, Lt. Chames was expected to sign an "acknowledgment stat[ing] that Sheriff Wade was financially responsible for [Lt. Chames'] raise and that [Lt. Chames] agreed to waive her rights as a civil service employee." (Id.). Lt. Chames refused to sign the document. (Id.). The other two lieutenants both received a $10,000 raise, exacerbating the pay gap. (Id.).

*Chames v. Calhoun County Comm'n*, ALND No. 1:20-cv-1826 (Doc. 13-1) (filed April 28, 2021). Having reviewed both EEOC charges and both case records, it seems that Chames did not blame Sheriff Wade for the lowball offer, and never mentioned a 'no future raises' condition, until Chames sued the Sheriff's Department after (a) Judge Axon dismissed her case against the County Commission and (b) the EEOC issued Chames a second right to sue letter, opening the door to sue the sheriff.

   iii. *Consequence*: Rule 56(e)(4) allows the court to enter an "appropriate order" if the nonmoving party "fails to properly support an assertion of fact" made in her opposition. The court finds that the appropriate order is not considering Chames' fact assertion that Wade conditioned the $5,000 raise on Chames' forfeiting all future raises when judging her discrimination claims. This ruling is warranted because Chames fails to properly support this assertion, and Wade denies it. *See* Fed. R. Civ. P. 56(c)(1). The ruling is appropriate—if not too lenient— because Chames told a different story to the EEOC and this court, then changed her tune after losing her case against the County Commission, leaving only the sheriff to sue.

—

To sum up, Wade presents evidence that would allow a reasonable juror to find that Chames was paid less than Murray and Hurst for two nondiscriminatory reasons: (1) Chames' job was fundamentally different and required less training and certification, and (2) Chames was employed within the civil service system, while Murray and Hurst were not. Chames fails to counter with evidence that would allow the same reasonable juror to instead find that Wade paid Chames less because of her race.

At best, Chames' opposition and supporting evidence demonstrate that she *believes* that Wade considered race when deciding who to remove from civil service status. But perception is not evidence, and "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (quotation omitted). And "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original) (quotation omitted).

Because Chames fails to create a genuine dispute whether race was a but-for cause of the pay gap, Wade is entitled to summary judgment on Counts 1 and 4. *See* Fed. R. Civ. P. 56(a); 56(e)(3).

## <u>Counts 5, 7</u>: Gender Discrimination, § 1983 and Title VII

In Counts 5 and 7, Chames argues that Wade paid her less than Murray and Hurst because Chames was female. Wade offers the same evidence that the court found would allow a reasonable juror to find either or both that (a) Wade had to pay Chames differently than Murray and Hurst because of civil service statutes and rules and/or (b) Wade paid Murray and Hurst differently than Chames because they performed different jobs, that required more qualifications, than Chames. Thus, to avoid summary judgment, Chames must offer enough evidence to allow

the same reasonable juror to instead find that Wade paid Chames differently because she was female. *See* Fed. R. Civ. P. 56(c); 56(e).

Chames, however, offers the same fact assertions to support her gender discrimination claim that the court rejected as supporting Chames' race discrimination claim. *See* (doc. 63, pp. 20-25). So the court adopts its analysis of Counts 1 and 4 to find that Chames' evidence fails to create a genuine debate about the reason for her pay disparity. *See* Fed. R. Civ. P. 56(c)(1); 56(e). Further, while the court does not apply *McDonnell Douglas* for the reasons explained*,* the court notes that Chames fails to point to any similarly situated male employees to help prove gender discrimination. Chames mentions only one male employee that held the same position that she did (corrections lieutenant): Judson Blewster. But it is undisputed that Blewster simultaneously worked for the Mental Health Board as a mental health officer, which resulted in extra pay from funds that Wade did not control.

Because Chames fails to create a genuine dispute whether gender was a but-for cause of the pay gap, Wade is entitled to summary judgment on Counts 5 and 7. *See* Fed. R. Civ. P. 56(a); 56(e)(3).


**Counts 6, 9**: **Unequal Pay, Equal Pay Act and Lily Ledbetter**

In Counts 6 and 9, Chames alleges that the pay gap between her, Hurst, and Murray violated the Equal Pay Act and the Lilly Ledbetter Fair Pay Act. But the LLFPA does not create independent causes of action; it clarifies how courts determine the start of the limitations period for challenging pay discrimination. *See Tarmas v. Sec'y of Navy*, 433 Fed. App'x 754, 760 (11th Cir. 2011). The court thus analyzes Chames' claim under the EPA.

1. *Legal standard*: "The EPA prohibits wage discrimination on the basis of sex and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex." *Baker v. Upson Reg'l Medical Ctr.,* 94 F.4th 1312, 1317 (11th Cir. 2024). Courts analyze EPA claims in

two steps. The first step is the plaintiff's prima facie case. To prove her EPA claim, Chames must show that her "employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id*. If Chames meets her burden, the second step is Wade proving one of four affirmative defenses: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any factor other than sex. *Id*.

Wade argues that it is entitled to summary judgment under both steps, but as explained below, the court needn't go past step one because Chames fails to create a genuine dispute on her required elements.

2. *Wade's evidence*: Wade argues that, in step one, Chames cannot prove that the job of corrections lieutenant (a) "requires equal skill, effort, and responsibility" and (b) is performed "under similar working conditions" compared to the job of investigations lieutenant and patrol lieutenant. *Id*. On the first point, Wade provides the Sheriff's Department's Standard Operating Procedure ("SOP," doc. 56-4) and points to multiple differences in the responsibilities of a corrections employee (SOP § 31), a patrol employee (SOP § 30), and an investigation employee (SOP § 32). Merely pasting the "responsibility" section for each division demonstrates that each division requires distinct skills, efforts, and responsibilities:

31.000    **CORRECTIONS DIVISION**

31.010    Functions and Responsibility

This division has the responsibility for the operation of the Calhoun County Jail and involves the custody, security and the care of all sentenced and pre-sentenced prisoners held in these facilities. This division has the primary responsibility for checking all in-coming prisoners for outstanding arrest warrants through the county, state and national computer systems, documentation of charges and for removing such persons from the system in accordance with jail procedures.

This division has jurisdiction over all persons booked into the county jail system during the time they are inmates of the jail division. It is also responsible for the location and status records for all county inmates. Additionally, it is responsible for stored personal property and clothing of all inmates.

30.000     **PATROL DIVISION**

30.010     Functions and Responsibility

This division is responsible for providing law enforcement services to the citizens of Calhoun County, including the performance of the basic tasks of protecting life and property, preserving the peace, ferreting out crime, suppressing criminal activity, and the apprehension of violators of the law.

Each Deputy individually and collectively is responsible for the following:

- Enforcing Federal, State and County statutes and ordinances
- Initial investigation of reported or observed crimes with follow up as needed
- Recording and preserving evidence found at crime scene
- Initial investigation of reports of missing, found or unidentified persons
- Responding to scenes of emergencies
- Arresting on-sight violators
- Recovering property
- Investigating complaints received from the public
- Patrolling to prevent and suppress crime
- Providing assistance to other public agencies pertaining to the elimination of
- health or safety hazards
- Maintaining law and order at public gatherings
- Preparing reports of incidents investigated or observed
- Observing and inspecting drivers, vehicles and roadways
- Supervising traffic movement as needed
- Checking and patrolling areas of high traffic hazard
- Arresting or citing traffic violators, issuing warnings on minor violations
- Preserving evidence
- Testifying in court
- Providing traffic information on request of the public
- Assisting members of the public or other public safety agencies as needed
- Security and transportation of prisoners
- Perform other duties as assigned

## 32.000    **CRIMINAL INVESTIGATIONS DIVISION**

### 32.010    Functions and Responsibility

The responsibility of the criminal investigations Division of the Calhoun County Sheriff's Office is to make a full investigation of all crimes reported in the area of operations of the Sheriff's Office, to assist other agencies on those occasions that a crime committed in another jurisdiction requires investigative efforts in Calhoun County and conduct investigations in Calhoun County as directed by supervision.

This Division will follow up on all reported felony crimes in the Sheriff's Office jurisdiction, initiate criminal investigations based on evidence or information reported, recover property, identify and preserve evidence, maintain a database of stolen property (hot sheet), criminal information and a list of reported crimes.

Division personnel will work with and assist as possible members of other public safety agencies in and around Calhoun County to solve criminal cases. Every attempt will be made to share criminal information with surrounding agencies. Investigating deputies will contact victims and advise them that they will be assigned to follow up on their case and co-ordinate with patrol units to check with persons in the area of the crime for information. Investigating deputies shall keep the victims of cases appraised of the status of their case.

Deputies assigned to the investigative division shall organize and maintain case files on all cases. Files will include a copy of report, statements of witnesses, lab reports, photographs, copies of documents, statements of suspects, copies of arrest warrants, search warrants and any other pertinent information. Deputies shall document all case work activity with supplemental forms. On all cases where an arrest has been made or the case is being presented to a grand jury, the deputy will provide the D.A. 's office with a case file with copies of all information listed above. Files are to be maintained at the Sheriff's Office.

Personnel will participate in regular training programs for professional development.

There is an on-call schedule for evenings and weekends. A copy of the list shall be forwarded to communications and other supervisors.

The on-call Investigator may operate their unmarked agency vehicle during the hours they are on call. The vehicle may be used for personal business as long as the business is appropriate to standards of professional conduct. The On Call Investigators may not use alcoholic beverages and be available for telephone contact via their agency issued phone.

(Doc. 56-4, §§ 30.010, 31.010, 32.010).

Of course, differing responsibilities means differing skills, training, and certifications. The skill and training required to investigate crimes is different from the skill and training required to manage confidential informants and make arrests, which is different from the skill and training involved in managing inmates housed in the county jail. It also means differing jurisdictions. Patrol, for example, covers all persons with the geographical boundaries of Calhoun County (SOP § 30.020), while corrections' jurisdiction is limited to "all persons booked into the county jail system during the time they are inmates of the jail division." (SOP § 31.010).

Simply put, Wade's evidence would allow a reasonable juror to find that Hurst, Murray, and Chames performed fundamentally different jobs that involved different skills, training, and jurisdiction. As a result, Wade is entitled to summary judgment on the EPA claims unless Chames provides evidence that would allow a reasonable juror to find instead that her job (a) "requires equal skill, effort, and responsibility" and (b) is performed "under similar working conditions" as the jobs performed by Hurst and Murray. *Baker*, 94 F.4th at 1317.

3. *Chames' evidence*: Chames does not point to any evidence that equates her job, credentials, and jurisdiction to Murray's and Hurst's jobs, credentials, and jurisdiction. She instead reiterates (a) the difference in pay between herself and her male colleagues and (b) Wade's ability to spend money to close the gap:

> [A] plaintiff may defeat summary judgment by pointing to a genuine dispute of a material fact in the Rule 56 record. The record in this case shows, that according to pay documents, Judson Blewster, Josh Doggrell, William Moses, Joey Stone, Falon Hurst, and Ronnie Murray, all males, received substantially more pay than Chames.
>
> Wade will likely reiterate in his reply, the simple reason for pay differences is APOST certification and differences in

> years on the civil service pay scale create the discrepancy in
> pay. But the record contains evidence that Wade had the
> ability to set pay wages for male employees while allowing
> them to receive future raises while the same prospect was
> not offered to Chames. Thus, summary judgment must be
> denied.

(Doc. 63, p. 33). Chames' argument misses the point. Proving that a male
co-worker is paid more is not enough. Nor is proving that Wade could have
paid female employees more. Chames *also* has to prove that a male
employee who was paid more than Chames performed a job that "requires
equal skill, effort, and responsibility . . . under similar working
conditions." *Baker*, 94 F.4th at 1317. Chames offers no such evidence. Nor,
when deposed, could Chames articulate the responsibilities of her male
comparators. *See* (doc. 51-1, pp. 53, 54, 72, 76, 84, 143).

Because Chames offers no evidence that would equate her
responsibilities, credentials, and jurisdiction to those of her male
comparators, Chames fails to create a genuine dispute of fact in step one
of her EPA claim. *See Baker*, 94 F.4th at 1317. Wade is thus entitled to
summary judgment on Counts 6 and 9. *See* Fed. R. Civ. P. 56(a); 56(e)(3).

## Count 2: Retaliation, § 1981 and 1983

Finally, Chames alleges in Count 2 that, in retaliation for Chames
complaining about the pay disparity among lieutenants to her supervisor,
Corrections Captain Eric Starr, Sheriff Wade offered her a $5,000 raise
instead of the $17,000 needed to close the pay gap.

1. *Legal standard*: "To establish a claim of retaliation under Title
VII or section 1981, a plaintiff must prove that he engaged in statutorily
protected activity, he suffered a materially adverse action, and there was
some causal relation between the two events." *Goldsmith v. Bagby
Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. &
Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Wade argues that offering

to pay Chames $5,000 a year *more* than her pre-complaint salary is not a materially adverse action.

2. *No genuine dispute*: The court needn't do a full Rule 56 analysis because the parties agree on the material facts:

- o Chames was offered a choice between (a) accepting a $5,000 raise and forgoing civil service status or (b) keeping her current salary and remaining in civil service status.
- o Chames declined the raise and stayed in civil service status.[3]

Because there is no genuine dispute on these material facts, the court faces a question of law: Was offering Chames a $5,000 raise, rather than a $17,000 raise, a materially adverse action?

As mentioned, retaliation claims under Title VII and § 1981 share the same elements. *Goldsmith*, 513 F.3d at 1277. In a Title VII case, the Supreme Court recently held that to prove discrimination against an employee with respect to the terms or conditions of her employment, the employee must show that the employer's action "brought about some 'disadvantageous' change in an employment term or condition." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354 (2024). Chames urges the court to apply the *Muldrow* test to her claim. (Doc. 63, p. 27).

The court obliges and finds that offering Chames a choice between a $5,000 raise or the status quo did not bring any disadvantageous change in Chames' employment terms and conditions. Chames was subject to the *same* terms, conditions, salary, and potential pay increases on (a) the day

---

[3] As discussed, the court finds that Chames' assertion that Wade conditioned the $5,000 raise on Chames' agreement to forgo all future pay increases is not properly supported by the record evidence. *See* Fed. R. Civ. P. 56(c)(1). So the court does not consider a 'no future raise' condition as part of the raise offer here. *See* Fed. R. Civ. P. 56(e)(4). That said, the court would still find that Chames cannot prove an adverse action even if Wade personally added a 'no future raise' condition to the $5,000 offer. As Wade points out, if Chames took the $5,000 and never received another pay raise, it would take more than a decade for the annual 1.31% pay increase to catch the one-time, up-front offer. So the $5,000 offer was not adverse to Chames' status quo, even considering the offer in the light least favorable to Wade.

she complained to Captain Starr and (b) the day she declined the $5,000 raise. Not only did the $5,000 offer not bring about a "disadvantageous" change, *Muldrow, supra,* it brought no change at all. Put in Rule 56 terms, no reasonable juror could find that being faced with a choice of more money or the status quo was an *adverse* response to Chames' complaint.

Chames offers a novel theory of adversity—*i.e.*, forcing Chames to repeatedly receive an insufficient paycheck:

> [E]ach time that Chames receives a paycheck that is insufficient, she suffers from an adverse action. Based on the premise in *Muldrow* regarding adverse actions, a reasonable jury could infer that all Chames has to show is that each paycheck leaves her in a financial disadvantage, to meet the adverse action threshold.

(Doc. 63, p. 30). This theory is flawed. Even if Chames' paycheck is insufficient, Chames was receiving the same insufficient check before she complained. That necessarily means that the check's deficiency was not an adverse reaction to Chames' complaint.

Because there is no genuine dispute of material fact, and Chames cannot meet an essential element of her retaliation claim, the court will grant Wade summary judgment on Count 2. *See* Fed. R. Civ. P. 56(a).

## CONCLUSION

For these reasons above, the court **GRANTS** Wade's motion for summary judgment and will **DISMISS** all counts **WITH PREJUDICE**.

The court will enter a separate order that carries out this ruling and closes this case.

**DONE** and **ORDERED** on August 7, 2025.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE